14-2442-cr (L)
*United States v. Lange*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2015

(Argued:     February 17, 2016       Decided:     August 15, 2016)

Docket Nos. 14-2442-cr, 14-4443-cr, 14-4559-cr

UNITED STATES OF AMERICA,

*Appellant-Cross-Appellee,*

v.

WILLIAM C. LANGE, AKA Kris Lange, JOSEPH G. PASCUA, FRANK E. PERKINS,

*Defendants,*

KRISTOFOR J. LANGE,

*Defendant-Appellee-Cross-Appellant,*

BRAD A. RUSSELL,

*Defendant-Appellant.*[1]

---

[1]     The Clerk of Court is respectfully directed to amend the official caption to conform to the above.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

Before:

JACOBS, CHIN, and DRONEY, *Circuit Judges*.

---

Consolidated appeals from an order and judgments of the United States District Court for the Eastern District of New York (Irizarry, *C.J.*) entered after defendants were convicted at trial of conspiracy and securities fraud. The Government appeals from the district court's order vacating the conviction of defendant Kristofor J. Lange on Count Three, the substantive securities fraud count, on the grounds that the evidence was sufficient to establish venue. Both defendants appeal their convictions on several grounds, including the sufficiency of the evidence as to venue and the propriety of the jury instructions.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

WINSTON M. PAES, Assistant United States Attorney (David C. James, Alixandra E. Smith, Assistant United States Attorneys, *on the brief*), *for* Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellant-Cross-Appellee*.

RICHARD D. WILLSTATTER, Green & Willstatter, White Plains, NY, *for Defendant-Appellee-Cross-Appellant.*

JAMES M. BRANDEN, Law Office of James M. Branden, New York, NY, *for Defendant-Appellant.*

---

CHIN, *Circuit Judge*:

In 2014, following a six-week trial, a jury found defendants Brad A. Russell and Kristofor J. Lange ("Kristofor") guilty of conspiracy to commit wire fraud and securities fraud (Count Two) in violation of 18 U.S.C. § 371 and substantive securities fraud (Count Three) in violation of 15 U.S.C. §§ 78j(b) and 78ff. The jury also found Russell guilty of conspiracy to commit wire fraud in connection with a separate but related scheme (Count One) in violation of 18 U.S.C. § 1349. Both defendants moved for a judgment of acquittal. The district court (Irizarry, *C.J.*) granted Kristofor's motion with respect to Count Three, finding insufficient evidence to establish venue in the Eastern District of New York, and otherwise denied the motions.

The Government appeals from the June 5, 2014 order vacating Kristofor's conviction on Count Three. Kristofor and Russell challenge their convictions on several grounds, including sufficiency of the evidence as to venue

on Counts Two and Three and the propriety of the jury instructions. For the reasons set forth below, we affirm Kristofor's and Russell's convictions, reverse the district court's order acquitting Kristofor on Count Three, and remand to the district court with instructions to reinstate Kristofor's conviction on Count Three and resentence Kristofor accordingly.

*BACKGROUND*

## I.    The Facts

Because Kristofor and Russell challenge their convictions based on the sufficiency of the evidence to support venue in the EDNY, we view the evidence "in the light most favorable to the government, crediting 'every inference that could have been drawn in its favor.'" *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994)).

The charges in this case arise out of defendants' involvement with William Lange ("Bill"), Kristofor's father and Russell's brother-in-law. Bill concocted schemes to defraud investors in two of his companies: (1) Harbor Funding Group, Inc. ("HFGI") and (2) Black Sand Mine, Inc. ("BSMI"). Through these schemes, Bill and his co-conspirators defrauded HFGI investors of over $9 million and BSMI investors of some $780,000.

### A. HFGI

In 2006, Bill formed HFGI as a mortgage company to process investor loans. When that business failed to prosper, he transferred its assets to another company in 2007 and announced a new strategy. HFGI would target individuals, land developers, and construction companies in need of capital for redevelopment projects in the Gulf-Opportunity Zone, which covered the region devastated by Hurricane Katrina, including Alabama, Louisiana, and Mississippi. Bill created a Board of Directors for HFGI, composed of himself, Stacey Lange (his wife), Russell, and Joseph Pascua, his long-time business partner.

In February 2008, HFGI began offering financing to investors. It issued letters of intent ("LOIs") representing that it had secured lender approval and commitments to fund projects within thirty days. These representations were false: HFGI had neither lender approval nor lender commitments to fund projects and was not capable of providing meaningful funding.

From February 2008 through early 2009, HFGI made loan commitments, requiring borrowers to pay a ten-percent deposit. The deposits were supposed to be held in escrow, to be refunded if the loan was not issued. Instead, HFGI diverted the deposits for other purposes: investing in leveraged

funds, paying salaries, and covering personal expenses. Over the course of the scheme, HFGI financed only one house to completion, and it failed to provide funding for hundreds of projects it had committed to finance. In total, HFGI diverted over $9 million from its clients' escrow accounts before shutting down and changing its phone number.

### 1. Kristofor's Involvement in HFGI

In 2006, Kristofor began working as an administrative assistant for his father at HFGI.[2] Kristofor was not centrally involved in the HFGI scheme, but did attend a number of staff meetings where the lack of funding and messaging to clients was discussed. Kristofor testified in the grand jury that he knew HFGI "wasn't working" and that as a result "we closed it down . . . and started another company." Gov't App. at 71. His grand jury testimony was admitted into evidence at trial.

### 2. Russell's Involvement in HFGI

Russell joined HFGI in 2006, working primarily as a loan processor. As a member of the Board, Russell attended a number of Board meetings and

---

[2] Kristofor was not charged in Count One for his participation in the HFGI scheme, but his involvement serves as background for his knowledge and participation in the BSMI scheme.

general staff meetings where HFGI's strategy to secure funding for Gulf-Opportunity Zone development projects was discussed.

As a loan processor, Russell was responsible for preparing and keeping custody of the loan documents for HFGI's clients. In this role, he was copied on emails with attachments from HFGI's escrow attorney reflecting the transfer of escrow funds to HFGI. Two land developers, whose clients were defrauded in the HFGI scheme, testified to Russell's participation in the scheme. One testified that when she met with the Board to discuss potential loans, Russell was present and spoke about the logistics of processing loans. She testified further that Russell was her primary contact, sending her accountings of her clients' escrow deposits, wiring instructions, and LOIs promising financing. Another testified to similar communications with and receipt of loan documents from Russell. Both testified that they repeatedly asked Russell about the delays in funding, and that he responded by claiming ignorance and directing them to Bill. Russell never told them that HFGI did not have the funds or a lender to finance projects, and did not reveal that their clients' deposits had been withdrawn from escrow. By late 2009, when HFGI could no longer maintain the

scheme and was over $9 million in debt, Russell, at Bill's direction, changed the office phone number.

## B.    BSMI

After HFGI ceased operations, Bill's companies were strapped for cash. Bill announced to his employees that they would start a new company, BSMI, to mine precious metals in Alaska. BSMI made multiple material misrepresentations to induce investors to purchase BSMI stock, including that: (1) HFGI had loaned BSMI $900,000; (2) BSMI had $850,000 available in total assets; and (3) investors' money would be used for expenses such as fuel, food, transportation, labor, and insurance. In fact, investor funds were used primarily to pay BSMI salaries and for personal expenses of BSMI co-conspirators. BSMI also concealed (1) Bill's involvement in BSMI by not disclosing his involvement in marketing materials and having him impersonate his son Kristofor, the BSMI Vice President, when speaking with investors[3] and (2) BSMI's connection to HFGI. These misrepresentations were made to investors both orally (via in-person presentations, over the phone, or via internet webinars) and in written

---

[3]    According to Joseph Pascua, such concealment was necessary to prevent potential investors from "looking into who Bill Lange was" because "if they did a Google search, they would find out that Bill Lange had various companies that owed people a lot of money." Trial Tr. at 1626.

materials (business plans, PowerPoint presentations, private placement memoranda, and an email newsletter). Victims invested $780,000 in BSMI.

### 1. *Kristofor's Involvement in BSMI*

Kristofor was Vice President of BSMI and a member of the BSMI Board of Directors. He attended key internal BSMI meetings, participated in meetings where BSMI solicited investors, and made sales calls to potential investors off a call list circulated by Russell. Kristofor allowed his father to pose as him when addressing investors. At times, Kristofor was present when his father impersonated him on the phone.

The BSMI business plan also contained material misstatements regarding Kristofor's past business, marketing, and mining experience. For example, the business plan stated that he (1) was an officer at First Choice Financial, another company owned by Bill, (2) had extensive mining experience, (3) was familiar with environmental issues and high-tech mining equipment, (4) worked for a finance company in marketing and was an officer of the company, and (5) worked for a consulting company using his marketing expertise to develop nationwide offices. Kristofor reviewed and approved his biography before it was included in the business plan. Many of the statements about his background were false or inaccurate. For example, Kristofor's mining experience

was limited to the time he spent helping his father as a child at Alaska mines, where he "helped with clean up," "helped move the rocks," and "play[ed] with [his] BB gun." Trial Tr. at 3315-16. Moreover, he was not an officer of First Choice Financial and functioned at HFGI largely as an administrative assistant.

### 2. Russell's Involvement in BSMI

Russell was a salaried employee of BSMI and, unlike Kristofor, was not an officer of the company. Russell's duties at BSMI included setting up and managing the company website and office email addresses, preparing, editing, and formatting the BSMI marketing materials -- including the business plan, placement memoranda, the PowerPoint presentation, and electronic newsletters -- and culling and distributing the call solicitation lists of potential investors. Russell reviewed, edited, and provided comments on the BSMI business plan, which contained misrepresentations about the background and work experience of the BSMI officers, omitted all references to HFGI, and contained false information about BSMI's assets. Russell also "scrubbed" a sales lead call list twice, to remove potential investors who were on the Federal Trade Commission's National Do Not Call Registry, and circulated it to the BSMI employees tasked with making cold calls, as discussed below.

### C. *Acts Occurring in the Eastern District*

BSMI operated out of Bill's home state in Washington, but solicited investors nationwide.[4] The Government asserts on appeal that two categories of acts establish venue in the EDNY with respect to the BSMI scheme: (1) cold calls to potential investors and (2) email correspondence with an apparent potential investor.

#### 1. *Cold Calls*

In May of 2010, Bill purchased a sales lead list to solicit capital for BSMI from investors nationwide. Several individuals, including Kristofor, were tasked with cold-calling potential investors. Three versions of the call list were circulated to employees to be used for those calls.

The first list (the "unscrubbed list") was circulated by Frank Perkins to Joseph Pascua and to an email address shared by Kristofor and Bill on May 25, 2010. The unscrubbed list, derived from and identical to the sales lead list, contained contact information for approximately 2,000 individuals, about 40 of whom had addresses within the EDNY. The Government established that this

---

[4] HFGI was also operated out of Washington, but one of the HFGI investors was located in Brooklyn, as was the escrow attorney. Russell does not challenge the jury's finding that this evidence was sufficient to establish venue in the EDNY on his conviction for Count One, conspiracy to commit wire fraud. Accordingly, we focus solely on acts occurring in the EDNY in furtherance of the BSMI scheme.

list was used by BSMI employees to make cold calls; one non-EDNY investor on that list who was initially solicited via cold call testified at trial.

Nine days later, Russell scrubbed the list to remove investors on the Do Not Call Registry and circulated a "scrubbed" list (the "first scrubbed list"). Russell sent the first scrubbed list by email to Julie Day, a BSMI employee, with a carbon copy sent to the email address that Kristofor shared with Bill. In that email, Russell stated that the list was "to replace the one I sent you last week to start researching" and that "[o]nly the ones with the area code in GREEN need[ed] to be researched." Gov't App. at 343. The first scrubbed list contained approximately 70 potential investors. Of these, 15 individuals had addresses in the EDNY, 14 of which were highlighted green. In that email, Russell stated "[l]et me know when you are running low [on contact numbers] and I will send a new list." *Id.*

Later that day, Russell circulated another list (the "second scrubbed list") to the email shared by Kris and Bill, copying Joseph Pascua and Frank Perkins. The second scrubbed list contained approximately 50 names, two of which had 718 area codes. The 718 numbers did not include corresponding

addresses and the Government did not establish that these individuals resided within the EDNY.[5]

Two BSMI employees, Judith Shulmire and Joseph Pascua, testified that cold calling was a key solicitation strategy for BSMI. Shulmire testified that the entire staff was tasked with making sales calls to potential investors from the circulated lists. Pascua also testified that three to five BSMI employees made cold calls to solicit investment. Pascua further noted that on a call with Bill and Frank Perkins, Bill stated that "he needed to get aggressive in calling investors" from the list and that he would identify himself as Kristofor in these calls. Trial Tr. at 1626. Shulmire also testified that Kristofor "made some sales calls" and participated in sales calls with his father where his father would pretend to be him, with Kristofor's consent. Gov't App. at 234. Kristofor also participated in pre- and post-call strategy sessions with his father and other BSMI staff.

2.    *Email Correspondence*

In July 2010, Postal Inspector Lucente, who worked and resided in the EDNY, viewed a webinar broadcast from the BSMI office in Washington that described potential investment opportunities in BSMI. On November 29, 2010, Inspector Lucente emailed the company under a pseudonym to express interest

_____

[5]    The 718 area code covers areas within and outside the EDNY.

in investing in BSMI. Inspector Lucente was located in his office in the EDNY when he communicated with BSMI. On November 30, 2010, Inspector Lucente received an email response from the address info@black-sand-inc.com thanking him for his interest in BSMI. Three days later, JoEll Pascua, Joseph Pascua's wife and a BSMI employee, sent Inspector Lucente a second email including a BSMI newsletter containing material misrepresentations about BSMI. On December 5, 2010, Joseph Pascua sent another email to Inspector Lucente, stating that "the opportunity may be limited with BSMI," citing BSMI's need to work with accredited investors with whom BSMI had a pre-existing relationship, but leaving open the possibility of working with Inspector Lucente. Trial Tr. at 2008.

## II.    *The Proceedings Below*

In December 2010, a grand jury in the EDNY indicted Bill and Joseph Pascua for wire and securities fraud in connection with both the HFGI and BSMI schemes. Over the course of the investigation, the Government interviewed Kristofor and Russell regarding their involvement in HFGI and BSMI, and both testified before the grand jury.

On November 21, 2011, Kristofor and Russell were indicted on two counts in connection with the BSMI scheme: (i) conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 371 (Count Two) and (ii) substantive

-14-

securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Count Three). Russell was also charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count One) in connection with the HFGI scheme.

At trial, at the close of the Government's case, Kristofor and Russell moved for a judgment of acquittal on Counts Two and Three, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, claiming primarily that the evidence was insufficient to establish venue in the EDNY. The district court ruled that the Government had presented sufficient evidence of venue on the conspiracy count (Count Two) but reserved decision as to venue for the substantive securities count (Count Three).

On March 6, 2014, the jury found Russell guilty on Count One and both Russell and Kristofor guilty on Counts Two and Three. Following the verdict, the defendants renewed their Rule 29(a) motion with respect to venue on Counts Two and Three and moved for acquittal on all counts on the basis that there was insufficient evidence of their knowledge and intent. Russell also sought a new trial on the basis that the district court erred in submitting "conscious avoidance" and "no ultimate harm" charges to the jury.

On June 5, 2014, the district court issued an opinion and order denying the motions, except that it granted Kristofor's motion with respect to Count Three.

The district court sentenced both defendants on November 13, 2014. Kristofor was sentenced to five years' probation and ordered to pay $780,000 in restitution to the victims of the BSMI fraud. Russell was sentenced to 120 months' imprisonment, and ordered to pay $10,707,894.59 in restitution to the victims of the HFGI and BSMI schemes.

These appeals followed.

## *DISCUSSION*

Two principal issues are presented on appeal: (1) the sufficiency of the evidence as to venue with respect to Counts Two and Three, and (2) the propriety of certain jury instructions. We address these two issues in turn, as well as certain additional arguments raised by defendants.

### I. *Venue*

#### A. *Applicable Law*

A defendant in a criminal case has the right to be tried in the district where the crime was "committed." U.S. Const. amend. VI; *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must

prosecute an offense in a district where the offense was committed."). "When a federal statute defining an offense does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *Tzolov*, 642 F.3d at 318 (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)). Venue may lie in more than one place if "the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985). Venue is proper "in any district in which an offense was 'begun, continued or completed.'" *Id*. at 483 n.4 (quoting 18 U.S.C. § 3237(a)).

We review a challenge to the district court's ruling regarding venue *de novo*. *Tzolov*, 642 F.3d at 318. The Government bears the burden of proving venue by a preponderance of the evidence. *Id.* Where the Government has prevailed at trial, we review the sufficiency of the evidence as to venue in the light most favorable to the Government, crediting "every inference that could have been drawn in its favor." *Id.* (quoting *Rosa*, 17 F.3d at 1542). Venue may be proved by circumstantial evidence. *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984).

*1.     Securities Fraud*

The Securities Exchange Act of 1934 provides for venue for criminal securities fraud "in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa(a). We have found that "venue is proper in a district where . . . the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue." *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008) (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)). To be "in furtherance of the charged offense," acts or transactions must *constitute* the securities fraud violation -- mere preparatory acts are insufficient. *Tzolov*, 642 F.3d at 319 (finding venue on a securities fraud count insufficient because defendants' flights in and out of airports in the EDNY were not acts constituting the violation). A securities fraud violation occurs where defendants "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device," including the making of material false statements. 15 U.S.C. § 78j(b).

Even without knowledge or intent to cause an act in furtherance of the crime to occur in the district of venue, venue may still be proper. In *Svoboda*, we held that a defendant need not intentionally or knowingly cause an act in furtherance of a charged offense to occur in the district to establish venue.

347 F.3d at 483. Instead, it is enough that "it is foreseeable [to the defendant] that such an act would occur in the district" and that act does in fact occur. *Id.*

Venue may also be established if the defendant aids and abets another's crime of securities fraud in the district. The aiding and abetting statute provides that a defendant who "aids, abets, counsels, commands, induces or procures [the] commission" of an offense against the United States is "punishable as a principal." 18 U.S.C. § 2(a). To prove that a defendant aided and abetted a substantive crime, the Government must establish that "the underlying crime was committed by someone other than the defendant and that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime." *United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999) (quoting *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996)).

Where guilt of a substantive offense is premised on aiding and abetting, "[v]enue is proper where the defendant's accessorial acts were committed *or* where the underlying crime occurred" because "18 U.S.C. § 2 alters the common law rule to provide an *additional* venue where . . . the principal[] acted." *Smith*, 198 F.3d at 383.

Accordingly, to establish venue in the district for a conviction of securities fraud, either directly or through aiding and abetting, the Government must prove that a criminal act occurred in the district of venue. "We must therefore 'discern the location of the commission of the criminal acts.'" *United States v. Rowe*, 414 F.3d 271, 278 (2d Cir. 2005) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)). "[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *Id*. (quoting *Rodriguez-Moreno*, 526 U.S. at 281).

In considering challenges to venue for other criminal acts, we have held that venue lies both in the district where a telephonic communication in furtherance of a crime was made and where it was received. *See United States v. Rommy*, 506 F.3d 108, 120 (2d Cir. 2007) (finding venue for drug conspiracy proper where conspirators made calls into the district and noting that "[i]n cases involving telephone calls between co-conspirators in different districts, we have ruled that venue lies 'in either district as long as the calls further the conspiracy'" (quoting *Smith*, 198 F.3d at 382)) (collecting cases); *United States v. Bushwick Mills, Inc.*, 165 F.2d 198, 202 (2d Cir. 1947) (explaining that an offer made by telephone in Brooklyn to an offeree in New York in violation of the Emergency Price

Control Act "may be prosecuted in either district"); *see also United States v. Stewart*, 878 F.2d 256, 257-58 (8th Cir. 1989) (upholding venue for a substantive drug offense and related conspiracy in North Dakota where phone calls were placed to a North Dakota landline but automatically forwarded and received in Minnesota because defendant "believed that he was calling [North Dakota], and indeed he was").

Venue is also proper in the district where an electronic communication was received. *Royer*, 549 F.3d at 895 (finding venue proper on a securities fraud charge, noting "[r]eceipt of electronic transmissions in a district is sufficient to establish venue activity there"); *Rowe*, 414 F.3d at 279-80 (venue proper for a conviction of advertising to receive, exchange, or distribute pornography where defendant posted an internet advertisement, it was foreseeable that the advertisement would be viewed within the district, and a law enforcement official viewed it in the district).

We hold that the same rules apply to securities fraud violations: Venue is proper not only in the district where telephonic or electronic materially fraudulent communications were initiated, but also in the district where such communications were received.

### 2. *Conspiracy to Commit Securities and Wire Fraud*

Venue is proper for conspiracy charges "in any district in which an overt act in furtherance of the conspiracy was committed." *Tzolov*, 642 F.3d at 319-20 (quoting *Royer*, 549 F.3d at 896) (defendants' act of boarding a plane at JFK airport, located in the EDNY, was an overt act sufficient to establish venue in the EDNY on conspiracy charge). "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy. The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Id.* at 320. "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." *Royer*, 549 F.3d at 896. The Government is "not restricted to the overt acts charged in the indictment in justifying its choice" of venue. *United States v. Schwartz*, 535 F.2d 160, 165 (2d Cir. 1976).

### 3. *Substantial Contacts*

"[O]n occasion we have supplemented our venue inquiry with a 'substantial contacts' test that takes into account a number of factors . . . ." *United States v. Rutigliano*, 790 F.3d 389, 399 (2d Cir. 2015) (quoting *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)). Those factors include "the site of the

defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." *Royer*, 549 F.3d at 895 (quoting *Reed*, 773 F.2d at 481). The substantial contacts inquiry is not a "formal constitutional test," but instead is a useful guide to consider "whether a chosen venue is unfair or prejudicial to a defendant." *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000).

### B. Application

The district court granted Kristofor's motion for acquittal as to Count Three, finding insufficient evidence of venue to support his substantive securities fraud conviction. The district court denied his motion as to Count Two, the conspiracy count, and denied Russell's motion on both Counts Two and Three.

Because "venue must be proper with respect to each count," *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989), and each defendant, we review each count in turn, beginning with Count Three.

#### 1. Securities Fraud

The Government does not contend that either defendant intentionally committed acts constituting the violation within the EDNY. Accordingly, to support a finding of venue in the EDNY, the evidence must have

-23-

been sufficient to establish that: (1) acts occurred in the district of venue, including acts committed by others, that constitute the violation, *Tzolov*, 642 F.3d at 319, and (2) these acts (a) were foreseeable to the defendants, *Svoboda*, 347 F.3d at 483, or (b) the defendants aided and abetted in the securities fraud scheme and are therefore liable for those underlying crimes committed by a principal within the district, *Smith*, 198 F.3d at 383. On the record before us, we conclude that a reasonable juror could find by a preponderance of the evidence that (i) acts occurred in the EDNY that constitute a violation of securities laws, and (ii) defendants were involved both because (a) these acts were foreseeable to them and (b) they aided and abetted the BSMI securities fraud scheme.

*i.*         *Acts in the EDNY Constituting Securities Fraud*

The district court did not err in concluding that a reasonable trier of fact could find that a BSMI co-conspirator committed acts within the EDNY that were in furtherance of the BSMI securities fraud scheme, and therefore constituted securities fraud.

The Government presented direct and circumstantial evidence that BSMI personnel telephoned and emailed residents of the EDNY to solicit

investments, *see Potamitis*, 739 F.2d at 791 (circumstantial evidence may establish venue), including the following:

- BSMI personnel engaged in cold calling to solicit investments;

- they did so aggressively, on a national basis;

- they did so using call lists that included dozens of individuals residing in the EDNY[6]; and

- BSMI personnel communicated with Inspector Lucente in the EDNY, and sent him an electronic newsletter used to solicit investments.

These communications within the district constituted securities fraud violations. The calls made by BSMI employees and email distribution of the BSMI newsletter "were crucial to the success of the scheme" of securities fraud and contained a number of material misstatements regarding the BSMI

---

[6] The unscrubbed list included approximately 40 individuals with EDNY addresses, representing two percent of the total names on the list. The first scrubbed list contained 15 individuals with EDNY addresses, representing 21 percent of the total names on the list. We have previously found that a jury could reasonably conclude venue was established based on circumstantial evidence where only 2.3 percent of paying subscribers to an insider tip website resided in the EDNY. *See Royer*, 549 F.3d at 894. There, the defendant sent private messages to his subscriber base advising them to short stock or publish information to affect the value of certain stock. *See id.* We concluded that "the jury could reasonably infer that it was more likely than not that one or more of these [EDNY] subscribers traded in the applicable securities." *Id.* Here, approximately two percent of EDNY residents were included on the unscrubbed list and approximately 18 percent of EDNY residents were included on the first scrubbed list. Accordingly, like in *Royer*, a reasonable juror could conclude that an EDNY resident was solicited.

scheme. *Royer*, 549 F.3d at 895. For example, the talking points and newsletter falsely provided that BSMI had a valuable gold mind in Alaska and that testing established that the mine contained great quantities of gold. Accordingly, these acts constituted securities fraud violations, and were not just preparatory. *See* 15 U.S.C. § 78j(b) (making it a violation to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device"); *cf. Tzolov*, 642 F.3d at 319 (concluding that boarding flights in the EDNY to travel to investor meetings where material false statements were made was insufficient to establish venue on substantive securities fraud count).

Russell and Kristofor argue that the email correspondence was merely preparatory because Inspector Lucente did not ultimately invest in BSMI. But whether Inspector Lucente, or any EDNY recipient of a cold call, actually invested is irrelevant. The making of an investment is not an element of the crime of securities fraud. Instead, the mere use of material misrepresentations to solicit investment is the "essential element of the crime" in furtherance of securities fraud. *Tzolov*, 642 F.3d at 318-9.

Considering the evidence "in the light most favorable to the government, [and] crediting every inference that could have been drawn in its

-26-

favor," *id.* at 318 (internal quotation marks omitted), we conclude that the jury could have reasonably found by a preponderance of the evidence that BSMI employees called and emailed residents of the EDNY for the purpose of soliciting investments through material misstatements.

### ii. *Defendants' Involvement*

For the reasons described below, we conclude that a reasonable juror could have found by a preponderance of the evidence that the acts occurring within the EDNY were foreseeable to defendants or that they aided and abetted the crimes of another BSMI employee within the EDNY.

### a. *Foreseeability*

The district court erred by failing to consider whether it was foreseeable to Kristofor that calls would be made to prospective EDNY investors. Kristofor participated in the BSMI inaugural strategy meeting where Bill stated that capital would be raised "[b]y selling stock to investors" and that "everybody in the company" was asked to solicit investors. Trial Tr. at 1482, 2977. Call lists and talking points were circulated to the email account shared by Kristofor and Bill. Two of those circulated calls lists contained names with EDNY addresses. Kristofor was tasked with and actually made sales calls, participated in pre-call

and post-call strategy meetings, and sat in on calls made by Bill. He also attended meetings where BSMI employees discussed strategies for soliciting investment over the phone, and specifically discussed the need to conceal Bill's involvement by having him pose as "Kris Lange" on calls. A reasonable jury could conclude that it was foreseeable to Kristofor that calls would be made to investors in the EDNY to solicit investment.

The district court also erred by concluding that the Government was required "to present evidence at trial of [Kristofor's] involvement in creating the newsletter or otherwise disseminating materially false information in this district" to establish venue through the EDNY email correspondence. Sp. App. at 17. It was foreseeable to Kristofor that investor solicitations would be followed up with electronic correspondence containing newsletters, private placement memoranda, or other solicitation materials to convince a potential target to invest with BSMI. Joseph Pascua sent a sample follow-up email to be used to solicit investments to Kristofor and other BSMI employees. Kristofor received multiple versions of these solicitation materials at his work email account, which he shared with his father.

Similarly, both the cold calls to potential investors within the EDNY and the email correspondence to Inspector Lucente were foreseeable to Russell. Testimony at trial established that Russell was responsible for scrubbing the call lists and distributing the culled lists to employees with instructions to solicit potential investors. He was therefore aware that investors within the EDNY were on the list, and were likely to be called as part of BSMI's strategy to solicit investment. At BSMI, Russell assisted with the preparation of materially false promotional materials, such as drafts of the business plan, business plan summary, and placement memoranda to be emailed to potential investors. He reduced the electronic file size of the business plan and business plan summary to "help when sending the file via email." Gov't App. at 935. Similarly, Russell reviewed a draft of the quarterly newsletter drafted by Pascua. In light of Russell's involvement in both the cold calls and the preparation of promotional materials to be sent to potential investors, it was clearly foreseeable to Russell that cold calls would be made to investors within the EDNY and that promotional materials, such as the newsletter, would be emailed into the district.

## b. *Aiding and Abetting*

Kristofor and Russell were charged in Count Three both as principals and as aiders and abettors pursuant to 18 U.S.C. § 2(a). A reasonable trier of fact could have concluded that both defendants aided and abetted the BSMI securities fraud by participating in the solicitation strategy, and could therefore be tried not only where they committed accessorial acts, but also "where the principal acted." *Smith*, 198 F.3d at 385.

Kristofor made cold calls to solicit investments, joined Bill on cold calls and in investor meetings, and allowed Bill to impersonate him to prevent potential investors from learning of Bill's tarnished reputation and involvement with HFGI. Russell scrubbed and circulated the call lists, and edited promotional materials for distribution to potential investors. Accordingly, both defendants aided and abetted the scheme of securities fraud and could be tried in any district where the other BSMI employees committed crimes in connection with the scheme, including the EDNY.

The district court erred by concluding that the Government was required to present evidence that Kristofor aided and abetted the specific acts carried out by other BSMI employees in the district of venue. Our precedent

-30-

does not require that a defendant aid and abet the specific criminal activity occurring within the district of venue.

In *Smith*, the defendant participated in a loan sharking and extortion conspiracy led by a co-defendant. 198 F.3d at 380. There, the defendant was charged with aiding and abetting substantive crimes of extortion. *Id.* at 383-85. We held that venue was proper for the defendant both where his accessorial acts were committed and where the principal committed a crime. *Id.* at 383. The government presented evidence that his co-defendant committed acts in the district to further his extortion scheme by calling his victims from the district of venue. We found that "[e]ven if [the defendant] committed all of his accessorial acts" outside of the district of venue, he could be tried in any district where the principal acted. *Id.* It was enough that the defendant aided the scheme generally; the jury was not required to find that he aided the specific acts of extortion committed within the district.

Here, just as in *Smith*, it was enough that other BSMI personnel committed acts in the district and that Kristofor and Russell aided and abetted the fraudulent scheme. *See Smith,* 198 F.3d at 383-85. Accordingly, venue was proper in the EDNY with respect to the substantive securities fraud count.

## 2. *Conspiracy*

The Government established by a preponderance of the evidence that conspirators committed, or caused to be committed, overt acts in furtherance of the BSMI conspiracy in the EDNY.

As set forth above, a reasonable juror could find that the following acts occurred in the EDNY in furtherance of the conspiracy: (1) cold calls by BSMI employees to the EDNY, (2) JoEll Pascua's electronic mailing of the BSMI newsletter to Inspector Lucente, and (3) Joseph Pascua's email communication with Inspector Lucente. These acts constituted overt acts in furtherance of the objectives of the conspiracy to commit securities fraud. *See Tzolov*, 642 F.3d at 320 (holding overt act need not be unlawful, provided it furthers conspiracy); *Rommy*, 506 F.3d at 119.

While a non-conspiring BSMI employee may have placed the cold calls, and JoEll Pascua (who was not charged in the conspiracy) sent some of the email correspondence to Inspector Lucente, this does not alter our conclusion that these acts were overt acts materially furthering the conspiracy, because a reasonable juror could surely conclude that the BSMI employees were instructed to take these acts by a conspirator. *See Royer*, 549 F.3d at 896 (overt acts include "acts that the conspirators caused others to take that materially furthered the

-32-

ends of the conspiracy"). The Government presented testimony establishing that Bill instructed the BSMI employees to make the cold calls. Similarly, it was reasonable to conclude that Bill or Joseph Pascua instructed JoEll Pascua to send the newsletter to potential investors as part of her administrative duties. These acts materially furthered the objectives of the conspiracy. Accordingly, the district court did not err in concluding that venue was properly established for both defendants with respect to the conspiracy count.

### 3. Substantial Contacts

Defendants argue that even if the acts occurring in the EDNY would otherwise establish venue for Counts Two and Three, venue is nevertheless improper because they did not have "substantial contacts" with the EDNY.

The substantial contacts "inquiry is made only 'if the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of the trial.'" *Rutigliano*, 790 F.3d at 399 (quoting *Coplan*, 703 F.3d at 80). Kristofor and Russell did not seek a pre-trial change of venue on grounds of prejudice or hardship; because they did not raise the issue of venue until after the close of the Government's case, it is questionable whether the substantial contacts test should be applied. *See Rutigliano*, 790 F.3d at 398.

In any event, we conclude that venue is proper even under the substantial contacts test. The Government's evidence was sufficient to establish that defendants and their co-conspirators attempted to solicit investment in BSMI from the EDNY, as well as across the country. BSMI maintained a website designed to attract investors across the United States, the BSMI investment recruitment scheme included solicitation of investment using nationwide call lists, and BSMI employees, including a co-conspirator, emailed with a potential investor in the EDNY. These "alleged criminal acts provide substantial contact with the district." *Reed*, 773 F.2d at 481. The factors to be considered in applying the substantial contacts test support this conclusion.

First, some of the co-conspirators' acts occurred in the EDNY, and the Government introduced evidence that both defendants aided and abetted those acts, as discussed above. Second, the criminal conduct had impact in the EDNY (on Inspector Lucente and likely others) and nationally (on various potential investors). Third, the elements and national reach of the crime of securities fraud carried out by defendants support venue in the EDNY. *See Royer*, 549 F.3d at 895 ("Indeed, the defendants, having concocted a scheme that . . . defrauded investors throughout the country, can hardly complain that their

-34-

very *modus operandi* subjected them to prosecution in numerous districts, including the Eastern District of New York."). Finally, the district court did not err in concluding that the Eastern District was no less suitable for accurate fact-finding than any other district involved in the scheme's implementation. While another venue may have been more convenient for defendants, "where the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue." *Reed*, 773 F.2d at 480. Accordingly, defendants had substantial contacts with the EDNY and conducting the trial in the EDNY was not unduly prejudicial.

## II.    *Jury Instructions*

We review a challenge to jury instructions *de novo. United States v. Coppola*, 671 F.3d 220, 247 (2d Cir. 2012). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury of the law." *United States v. Nektalov*, 461 F.3d 309, 313 (2d Cir. 2006) (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)). We will reverse only if "the charge, viewed as a whole, demonstrates prejudicial error." *Coppola*, 671 F.3d at 247. Where a "defendant requested a different jury instruction from the one actually given, the defendant 'bears the burden of showing that the requested instruction accurately represented the law in every

respect and that, viewing as a whole the charge actually given, he was prejudiced.'" *Nektalov*, 461 F.3d at 313-14 (quoting *Wilkerson*, 361 F.3d at 732).

On appeal, the defendants argue that the district court erred in its "conscious avoidance" and "no ultimate harm" charges to the jury. Each instruction is discussed below.

### A.    The Conscious Avoidance Instruction

"The conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found when the jury is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence." *Svoboda*, 347 F.3d at 477 (internal quotation marks omitted). "Thus, a conscious avoidance instruction is warranted (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction and (ii) the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Nektalov*, 461 F.3d at 314 (citations and internal quotation marks omitted).

*1.    The Conscious Avoidance Doctrine in the Conspiracy Context*

Kristofor contends that the district court erred by failing to instruct the jury that conscious avoidance may not be used as a substitute for knowing participation in a conspiracy.

On a charge of conspiracy, the Government must prove "(1) knowing participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme." *United States v. Ferrarini*, 219 F.3d 145, 154-55 (2d Cir. 2000) (internal quotation marks omitted). "Conscious avoidance may not be used to support a finding as to the former, i.e., intent to participate in a conspiracy, but it may be used to support a finding with respect to the latter, i.e., knowledge of the conspiracy's unlawful goals." *Id.; see also Svoboda*, 347 F.3d at 478-79 ("[T]he conscious avoidance doctrine may be invoked to satisfy the requirement that a defendant [knew] of the unlawful aims of the conspiracy," but "[t]here must be further proof that the defendant joined in the illegal agreement with the intent of helping it succeed in its criminal purpose."). Where the conspiracy jury instruction requires a finding that the defendant possessed the requisite intent, the instructions "cannot be taken to permit the jury to infer the necessary intent to join the conspiracy from mere conscious avoidance." *Ferrarini*, 219 F.3d at 156.

The district court did not include Kristofor's requested instruction that conscious avoidance may never be used as a substitute for knowing participation.[7] The conspiracy jury instructions advised jurors that the Government had to prove beyond a reasonable doubt that the defendants participated with knowledge and intent. The district court noted that it had just explained in its general instructions "what it means to act knowingly and intentionally." Trial Tr. at 3820. The general definition of "knowingly" had included language on conscious avoidance.[8]

---

[7]    Specifically, Kristofor's counsel requested that the district court "instruct the jury that conscious avoidance may never be used as a substitute for knowing participation or membership in the conspiracies and schemes to defraud charged in the Indictment. In other words, the government must prove that the defendant being considered knowingly participated in and became a member of the conspiracy or scheme to defraud alleged in a particular count of the Indictment being considered." Def. Kristofor J. Lange's Proposed Jury Instructions at 1, Dkt. No. 1:10-cr-00968, ECF No. 254. Counsel relied on *United States v. Lewis*, 545 F. App'x 9 (2d Cir. 2013) (summary order), to bolster his challenge to the instruction that was actually given. That non-precedential summary order notes that a conscious avoidance jury instruction is erroneous if it "convey[s] to the jury that one could innocently join an undertaking without knowing of its illegal character, and that conscious avoidance of later indications of wrongful behavior was sufficient to make that person a member of a criminal conspiracy." *Lewis*, 545 F. App'x at 11.

[8]    The district court's conscious avoidance instruction provided:

> In determining whether the defendant acted knowingly, you
> may consider whether the defendant deliberately closed his
> eyes to what otherwise would have been obvious to him.
> You may only infer knowledge of the existence of a

The district court's conspiracy charge instructions, however, would not have permitted the jury to substitute conscious avoidance for intent. The instructions clearly provided that the Government had to prove that the defendants intentionally engaged in the conspiracy. For example, the charge instructed that "the government must prove beyond a reasonable doubt . . . that the defendants knowingly and intentionally became a member of the conspiracy," *id*. at 3819, the defendant "must have participated with knowledge of at least some of the purposes or objectives of the conspiracy, and with the intention of aiding in the accomplishment of the unlawful end, *id.* at 3823, and "[i]n sum, a defendant . . . must have intentionally engaged, advised or assisted

particular fact if the defendant was aware of a high probability of its existence unless the defendant actually believed that it did not exist. If you find beyond a reasonable doubt that the defendant acted with a conscious purpose to avoid learning a highly probable truth, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, careless or mistaken. It is entirely up to you to determine whether the defendant deliberately closed his eyes and what inferences, if any, fairly may be drawn from the evidence on this issue. Whether the defendant acted knowingly may be proven by a defendant's conduct and by all of the facts and circumstance surrounding the case.

Trial Tr. at 3816-17; *see also* Leonard Sand et al., *Modern Federal Jury Instructions—Criminal*, ¶ 3A.01, at 3A-2 (2011 ed.) (model conscious avoidance instruction identical in substance to the district court's instruction).

in [the conspiracy] for the purpose of furthering the illegal undertaking," *id.* The instructions required the jury to find that the defendants intentionally joined the conspiracy to convict, and accordingly, the instructions did not allow the jury to infer intent from mere conscious avoidance. *See Svoboda*, 347 F.3d at 478-79 (upholding a similar instruction defining knowledge to include conscious avoidance, where the instructions required "further proof that the defendant joined in the illegal agreement with the intent of helping it succeed in its criminal purpose").

### 2. Factual Predicate for the Instruction

Russell contends on appeal that it was improper to instruct the jury on conscious avoidance for both the HFGI and BSMI conspiracies, because there was no factual predicate for the instruction. Specifically, Russell argues that because the "record evidence indicates that [the defendant] had actual knowledge [of the object of the conspiracy], there was no factual predicate for a conscious avoidance charge." *United States v. Kaplan*, 490 F.3d 110, 128 (2d Cir. 2007) (emphasis omitted).

"[A] conscious avoidance instruction is warranted (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction and (ii) the appropriate factual predicate for the charge exists . . . ."

*Nektalov*, 461 F.3d at 314 (citations and internal quotation marks omitted).  To establish a factual predicate, there must be evidence that "the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  *Id.* (internal quotation marks omitted).  Contrary to Russell's assertion, where the defendant asserts a lack of actual knowledge, the Government need not choose between an actual knowledge and a conscious avoidance theory because ordinarily "[t]he same evidentiary facts that support[] the government's theory of actual knowledge also raise[] the inference that he was subjectively aware of a high probability of the existence of illegal conduct and thus properly serve[] as the factual predicate for the conscious avoidance charge."  *United States v. Cuti*, 720 F.3d 453, 464 (2d Cir. 2013); *see also Svoboda*, 347 F.3d at 480.  A factual predicate "may be established where[] a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge."  *Svoboda*, 347 F.3d at 480 (alterations and internal quotation marks omitted).

Here, there was a factual predicate for the district court's conscious avoidance charge.  The Government presented ample evidence of both Russell's

involvement in the schemes and Russell's attempts to avoid specific knowledge. *See Cuti*, 720 F.3d at 463 ("The Government need not choose between an actual knowledge and a conscious avoidance theory." (internal quotation marks omitted)). This included evidence that Russell knew (1) of the lack of funding for the HFGI scheme, of the transfer of funds out of the client escrow accounts, and that BSMI's business plan and PPM contained material misrepresentations, and (2) avoided learning of the HFGI fraudulent scheme, by refusing to respond to the questions of dissatisfied investors and instead referring them to Bill. Based on this evidence, the jury could reasonably infer that if Russell lacked actual knowledge, he was "subjectively aware of a high probability of the existence of illegal conduct," *Cuti*, 720 F.3d at 464, and "purposeful[ly] contriv[ed] to avoid guilty knowledge," *Svoboda*, 347 F.3d at 480.

Moreover, the charge was warranted because Russell argued at trial that he lacked knowledge of the nature of the fraudulent schemes. During summation, Russell's counsel asserted a lack of specific knowledge required for conviction, noting that Russell "didn't know" that HFGI was defrauding clients, Trial Tr. at 3683-84, "did not know when the funding would be available," *id.* at 3693, claimed that "there's no way . . . he would know if the metallurgical reports

-42-

in the [BSMI] business plan were accurate," *id.* at 3702, and had "no reason . . . to know" about the money and assets of BSMI, *id.* The charge was more than appropriate in light of this defense. *Cuti*, 720 F.3d at 464 ("[Defendant's] purported lack of knowledge defense, despite [his] deep involvement in the transactions that effectuated the fraud, all but invited the conscious avoidance charge."). Accordingly, the district court did not err by instructing the jury on a theory of conscious avoidance.

### B.    *The No Ultimate Harm Instruction*

Russell argues that the district court erred in giving a "no ultimate harm" charge to the jury for both the HFGI and BSMI schemes.[9] He contends that the charge was inapplicable because he made no false or misleading statements to investors or potential investors. This argument is without merit.

---

[9]    The district court's no ultimate harm instruction provided:

> You are instructed that if the defendant participated in the scheme to defraud, then a belief by the defendant, if such belief existed[,] that ultimately everything would work out so that no one would lose any money, does not require you to find that the defendant acted in good faith. No amount of honest belief on the part of the defendant that the scheme would, for example, ultimately make a profit for investors[,] would [excuse] fraudulent actions or false representations caused by him.

Trial Tr. at 3829.

A "no ultimate harm" instruction given by the district court is proper where (1) there was sufficient factual predicate to necessitate the instruction, (2) the instruction required the jury to find intent to defraud to convict, and (3) there was no evidence that the instruction caused confusion. *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999).

The instruction here was proper. First, there was a factual predicate for the instruction, because there was evidence that Russell's co-conspirators intended to immediately deprive investors of their capital through fraud, even if they truly believed that in the long-term HFGI and BSMI would ultimately succeed, deriving profits for the defrauded investors. *See, e.g., United States v. Rossomando*, 144 F.3d 197, 2001 (2d Cir. 1998) (noting that "where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse"). Second, the instructions clearly required that the jury find that the defendants intended to defraud investors. Third, there is nothing in the record to suggest that the instruction caused any confusion. *See Berkovich*, 168 F.3d at 67.

### III.  *Defendants' Additional Arguments*

The defendants raise a number of additional arguments on appeal, which we consider and reject.

First, Kristofor argues that the district court violated the rule of completeness by admitting redacted portions of his grand jury testimony while excluding other portions.  The omitted portions, however, were not necessary to place the admitted portions in context.  *See United States v. Johnson*, 507 F.3d 793, 796-97 (2d Cir. 2007) (holding rule of completeness requires admission if necessary to explain or put admitted portion in context or avoid misleading jury).  The omitted statements were generally post-hoc explanations for prior conduct, which did not alter the meaning of the admitted redacted portion.

Next, Kristofor argues that the district court abused its discretion with respect to a number of evidentiary rulings.  This argument is without merit. We reverse a district court's evidentiary rulings "only if we find manifest error," that is not "harmless," *United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010) (internal quotation marks omitted), and upon review of the record before us, we conclude that there was no such manifest error here.

Finally, Russell argues that his indictment was obtained in violation of his Fifth Amendment privilege against self-incrimination.  Russell, however,

knowingly waived his Fifth Amendment right at the time of his testimony.

Moreover, even if Russell's grand jury evidence had been obtained in violation of his Fifth Amendment right against self-incrimination, the suppression of such testimony at trial, not the dismissal of the indictment, would have been the appropriate remedy. *United States v. Rivieccio*, 919 F.2d 812, 816 (2d Cir. 1990). Russell's grand jury testimony was not introduced at trial. Accordingly, there was no need to suppress the testimony or dismiss the indictment.

### *CONCLUSION*

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in part and **REVERSED** in part and we **REMAND** to the district court with instructions to reinstate Kristofor's conviction on Count Three and resentence Kristofor accordingly.