*USA v. Chow*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2019

(Argued: January 6, 2020                    Decided: April 6, 2021)

Docket No. 19-0325

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

BENJAMIN CHOW, AKA Ben Chow Zhou Bin, AKA Benjamin Bin
Chow, AKA Bin Zhou,

*Defendant-Appellant.*
_____

Before: KEARSE, CARNEY, and BIANCO, *Circuit Judges.*

Appeal from an amended judgment entered in the United States District

Court for the Southern District of New York following a jury trial before Gregory H.

Woods, *Judge*, convicting defendant on one count of conspiracy to commit securities

fraud in violation of 18 U.S.C. § 371, one count of securities fraud in violation of 18 U.S.C. §§ 1348 and 2, and six counts of insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 10b5-2, and 18 U.S.C. § 2; and sentencing him principally to three months' imprisonment, to be followed by a two-year term of supervised release. On appeal, defendant contends principally that his execution of confidentiality agreements with a company whose acquisition he was exploring was insufficient to subject him to prohibitions against insider trading; that, if he had a duty of nondisclosure, the evidence was insufficient to show that he breached that duty or, if he did, that he profited thereby; and that venue was not proper in the Southern District of New York. Finding no basis for reversal, we affirm.

Affirmed.

ELISHA J. KOBRE, Assistant United States Attorney, New York, New York (Geoffrey S. Berman, United States Attorney for the Southern District of New York, Scott Hartman, Max Nicholas, Sarah K. Eddy, Assistant United States Attorneys, New York, New York, on the brief), *for Appellee*.

PAUL D. CLEMENT, Washington, D.C. (Erin E. Murphy, C. Harker Rhodes IV, Kirkland & Ellis, Washington D.C., Thomas Burnett, Kirkland & Ellis, New York, New York, on the brief), *for Defendant-Appellant*.

2

KEARSE, *Circuit Judge*:

Defendant Benjamin Chow appeals from an amended judgment entered in the United States District Court for the Southern District of New York following a jury trial before Gregory H. Woods, *Judge*, convicting him on one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, one count of securities fraud in violation of 18 U.S.C. §§ 1348 and 2, and six counts of insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 10b5-2, and 18 U.S.C. § 2; and sentencing him principally to three months' imprisonment, to be followed by a two-year term of supervised release. On appeal, Chow contends principally that his execution of confidentiality agreements with a company whose acquisition he was exploring was insufficient to subject him to the prohibitions against insider trading in 15 U.S.C. §§ 78j(b) and 78ff, or the Securities and Exchange Commission ("SEC") rules in 17 C.F.R. §§ 240.10b-5 ("Rule 10b-5") and 10b5-2 ("Rule 10b5-2"). He also contends that if he had a duty of confidentiality, the trial evidence was insufficient to show that he breached it or, if he did, that he profited thereby; and he contends that venue was not proper in the Southern District of New York. Finding his contentions to be without merit, we affirm.

# I. BACKGROUND

The present prosecution of Chow had its origin in an investigation by the Financial Industry Regulatory Authority ("FINRA")--an entity authorized by Congress to regulate the NASDAQ Stock Market ("NASDAQ") and the New York Stock Exchange--into trading in the stock of Lattice Semiconductor Corporation ("Lattice") in connection with Lattice's announcement on November 3, 2016, that it was being acquired by Canyon Bridge Capital Partners, Inc. ("Canyon Bridge"), a fund founded by Chow. FINRA made inquiries of Canyon Bridge personnel, and others, about a list of persons whom FINRA had flagged for suspicious trading activity, including one "Yin, Shaohua (Michael)" (Government Exhibit ("GX") 1202). It later came to light that Yin, through accounts held in names other than his own, had amassed more than seven million shares of Lattice from July 5 through November 2, 2016, *i.e.*, in the four months prior to the Lattice announcement; those accounts sold roughly half of their shares on November 3 following the announcement, at a profit of some $5 million. Canyon Bridge informed FINRA that Yin was a social acquaintance and former business colleague of Chow.

A. *The Trial Evidence*

The government's evidence at Chow's nine-day trial included testimony by investigators and analysts from FINRA and the Federal Bureau of Investigation ("FBI"), testimony by Lattice's then-Chief Executive Officer ("CEO") Darin Billerbeck, and communication records extracted from smartphones belonging to Chow and Yin. Taken in the light most favorable to the government, the evidence presented at trial included the following.

1. *Chow's 2016 Negotiations for the Acquisition of Lattice*

Lattice, headquartered in Portland, Oregon, was a manufacturer of a type of semiconductor known as Field-Programmable Gate Arrays ("FPGAs"), used in smartphones; Lattice's shares were traded on the NASDAQ. In 2015, its management began to explore the possible sale of the company and hired the investment bank Morgan Stanley to assist in the effort. Published reports quoted CEO Billerbeck as stating that the company was available for sale at a premium. There were reports that Lattice would be acquired by a Chinese buyer; and it engaged in merger discussions with two Chinese private-equity firms.

In April 2016, China Reform Fund Management Co., Ltd. ("China Reform"), a Chinese State-owned firm, contacted Morgan Stanley to express interest in acquiring Lattice. China Reform's managing director was Chow, who led its negotiations and began to correspond regularly with Billerbeck, meeting with him several times in Portland.

On April 27, Billerbeck and Chow, on behalf of their respective firms, executed a nondisclosure agreement (the "April NDA"). The April NDA provided, *inter alia*, that "[e]ach Party agrees not to disclose, commercialize, or use any Proprietary Information of the other Party for any purpose, except to evaluate and/or engage in discussions regarding, and potentially pursue and effect, the potential business transaction involving the Parties." (GX-849, ¶ 4a; *see* Trial Transcript ("Tr.") 136.) It also provided that

> [t]he fact of the exploration and evaluation of a potential strategic relationship between the Parties shall be deemed "Confidential" and subject to the protections of this Agreement as Proprietary Information.

(GX-849, ¶ 1; *see* Tr. 134-35.) Billerbeck testified that one reason Lattice insisted on confidentiality as to the existence of negotiations was to protect shareholders, since

leaks that such discussions were occurring could give one group of shareholders an advantage over another. (*See* Tr. 129.)

The parties also took several other precautions to minimize disclosure of the existence of their negotiations. For example, in connection with the potential acquisition, they used code names for themselves and for each other. In Portland, they met in hotel conference rooms rather than at Lattice's offices. And their written or graphic presentations to each other bore reminders of the nondisclosure agreement or other legends forbidding disclosure. (*See, e.g.*, GX-852 (Lattice presentation on May 5 bearing the caveat, "*Provided under NDA* to China Reform Fund Management Company Limited" (emphasis added)); Tr. 142.)

In the summer of 2016, Chow submitted three China Reform nonbinding offers ("NBOs" or "offers") to acquire Lattice, each of which noted that it was "subject to" the April NDA (GX-807, at 4; GX-815, at 4; GX-821, at 4). On July 6, Lattice's stock price closed at $5.32 a share. China Reform's first NBO, on July 7, was for $8 a share, about a 50 percent premium. Its second NBO, made on July 28, offered $8.75-$9 a share, a premium of about 45 percent over Lattice stock's July 28 closing price of $6.14.

7

In its second NBO, China Reform requested of Lattice--and eventually was granted--a period of "exclusivity" through August 21, which prohibited Lattice from entertaining any other offers for the company during that period (Tr. 206). It is common for a prospective buyer to request such a period of exclusivity prior to undertaking due diligence, a process that requires the expenditure of significant resources for close scrutiny of the seller's business. (*See, e.g.*, Tr. 195-97, 204-05.) Thus, the existence of an exclusivity agreement generally indicates that both the seller and the prospective buyer are serious about pursuing the transaction.

During China Reform's exclusivity period, Lattice released a report of quarterly earnings that were below levels it had predicted, which resulted in a decline in its stock price. On August 21, 2016, China Reform submitted its third NBO, lowering its offer to $8.30 a share. Lattice's board of directors rejected the offer and instructed that Morgan Stanley search for other suitors.

On August 22, the day after China Reform's exclusivity period expired, Chow informed Lattice that he was leaving China Reform and starting his own United States-based fund. Chow indicated that his new fund--Canyon Bridge--would submit a proposal to Lattice. Billerbeck's initial understanding was that Canyon Bridge was to be a private-equity firm (*see, e.g.*, Tr. 220-21), *i.e.*, a company that uses

8

privately generated funds to acquire or invest in companies that it expects to grow in value (*id*. at 122). However, he soon learned that Canyon Bridge was a subsidiary of State-owned China Reform and that significant funding for Canyon Bridge would actually come from China Reform (*see id*. at 219-23; GX-833).

On September 9, Chow (for Canyon Bridge) and Billerbeck signed a new nondisclosure agreement (the "September NDA"). Its confidential-information provisions were identical to those in the April NDA. (*See* GX-848; GX-849.) On September 10, Canyon Bridge submitted an NBO; the fact that Lattice was exploring a relationship with Canyon Bridge was expressly subject to the September NDA, just as Lattice's discussions with China Reform had been subject to the April NDA.

On September 13, Canyon Bridge presented Lattice with a first draft of a merger agreement. Lattice agreed to give Canyon Bridge exclusivity through October 18--which was later extended, first to October 26 and then to October 28. On November 3, 2016, Lattice issued a press release announcing it would be acquired by Canyon Bridge. On that day, Lattice's stock price rose 18 percent.

The acquisition, however, never occurred. In March 2017, the Committee on Foreign Investment in the United States ("CFIUS")--the United States Government inter-agency committee charged with reviewing foreign acquisitions of United States

companies or technologies--informed Lattice that the merger would not be approved because CFIUS "believed that Canyon Bridge was still a Chinese entity, and that" it would have "too much control and influence over Lattice Semiconductor technology and intellectual property" (Tr. 257).

2. *Communications between Chow and Yin in 2016, and Yin's 2016 Trading in Lattice Stock*

As indicated above, federal authorities became aware of unusual trading in Lattice stock in the latter part of 2016. In March 2017, FINRA sent a letter to counsel for Canyon Bridge and China Reform, inquiring whether their corporate officers who were familiar with the proposed Lattice acquisition knew any of the persons on a list of people whom FINRA had generally flagged for suspicious trading activity. As to any of the persons they knew, the officers were asked to describe, *inter alia*, the nature of their relationship with, and to summarize any contacts with, those persons from "September 9, 2016 through November 2, 2016." (GX-1202). As a person of interest in certain other FINRA investigations, "Yin, Shaohua (Michael)" (hereafter "Yin") was on the list (*id*.), although FINRA then had no knowledge that he had traded in Lattice stock.

Canyon Bridge responded to the FINRA inquiry on April 11, 2017, stating in pertinent part as follows:

> Ben Chow recognized Mr. Yin as a former colleague at Warburg Pincus Asia and as a social acquaintance. Dr. Chow believes he had coffee with Mr. Yin in July 2016 at which time they discussed the semiconductor industry generally and Dr. Chow asked whether Mr. Yin could forward semiconductor industry analyst reports. Dr. Chow recalls subsequently receiving a research report on Xilinx Corporation. Dr. Chow also believes he and Mr. Yin had a conversation in August 2016 after Mr. Yin had seen news reports about the formation of China Venture Capital Fund Corporation Limited. Dr. Chow recalls he asked Mr. Yin whether he could recommend possible limited partners. During the Relevant Period, Dr. Chow may have exchanged social WeChat messages with Mr. Yin. Dr. Chow does not recall discussing Lattice with Mr. Yin and is not aware of any circumstance by which Mr. Yin may have gained knowledge of Canyon Bridge's business activities relating to the Corporate Disclosure during the Relevant Period.

(GX-1206; *see* Tr. 703.)

Investigation by the FBI revealed that Yin controlled five accounts in the names of others at the Interactive Brokers brokerage firm (collectively, the "Yin Accounts" or "Accounts"), including two in the names of his parents. FBI Special Agent John Walthers testified that the Yin Accounts began trading in Lattice stock in November 2015. Prior to July 2016--when, phone records revealed, Yin began communicating frequently with Chow--the Accounts had never held a total of more

11

than 200,000 shares of Lattice, and they had sold most of their shares in the Spring of 2016, leaving them in late June with just under 34,000 shares.

Analysis of the contacts list on Chow's phone indicated that he had known Yin since at least 2011. Each of them was, at one time, associated with the private-equity firm Warburg Pincus, although their tenures at the company apparently overlapped little, if at all. Chow's phone contained five phone numbers for Yin.

On July 5--two days before Chow submitted China Reform's first offer to purchase Lattice--Chow contacted Yin to propose a meeting. The two met that day at a Starbucks in Beijing. Two hours after the NASDAQ next opened for trading in New York, one of the Yin Accounts purchased 248,268 shares of Lattice, a sevenfold increase in the Accounts' Lattice position.

On July 12, Yin sent Chow emails that, *inter alia*, attached analyst reports on FPGAs and recommended two investment bankers at "Jefferies." In an email to the Jefferies bankers, Yin asked them to introduce Chow to a Jefferies analyst who focused on the semiconductor industry; Yin added that Chow would be spending the next three weeks in the United States "mainly [on the] west coast," and that Chow and the bankers "may find some opportunities for future business." (GX-1088, at 1.)

Also on July 12, Chow and Yin spoke on the phone for approximately five minutes, and exchanged text messages in which Yin offered also to put Chow in touch with a "CFIUS related lawyer" (GX-1003T, at 3). Chow thanked Yin for his help, and the two agreed to meet the following day. Over the course of the next ten days, the Yin Accounts purchased another 280,283 shares of Lattice, nearly doubling their position. Six days later, on July 28, China Reform submitted its second offer to acquire Lattice.

On August 10, in response to a WeChat message from Yin asking whether Chow had "returned to Beijing," Chow stated that he was "making a deal [and] can't come back." (GX-1003T, at 4-5). Yin commented, "being in the west coast is better than being in Beijing" (*id*. at 5), and less than a minute after the NASDAQ next opened, a Yin Account began purchasing another 120,000 shares of Lattice (GX-1517D).

On September 12--one day before Canyon Bridge presented Lattice with a first draft of a merger agreement--Chow and Yin agreed to meet in person on September 13 in Beijing. Later on September 13, minutes after the NASDAQ opened in New York, the Yin Accounts bought more than 100,000 shares of Lattice; and in the next three days the Yin Accounts purchased 1,005,111 additional Lattice shares, more

13

than redoubling their position. After the last such purchase on September 16, Yin sent a text message to an associate stating that "[a] friend of mine recently said that Lattice Semiconductor's project is moving forward. If quick, there would be intentions by mid October" (Tr. 843). The mid-October date was consistent with the October 18 expiration date of the exclusivity agreement between Lattice and Canyon Bridge.

On September 21, Yin left a voice message for Chow referring to "the company that does FPGA," and stating that he had heard from a banker that that company had "considerable concern with regard to CFIUS," that "they may not even consider the Chinese buyer," and that Chow should be "mentally prepared for it." (*Id*. at 845-46.) But Chow replied, "right now we are over at this (unintelligible) company. We should already be signing the contract soon." (*Id*. at 846.) Beginning the next day, and continuing for some three weeks, the Yin Accounts proceeded to purchase a total of 2,206,760 more shares of Lattice.

Yin and Chow next met in Beijing on October 17, the day before Canyon Bridge's exclusivity was scheduled to end. Lattice extended the exclusivity period to October 26 the next day; and following the Chow-Yin meeting, the Yin Accounts from October 17-24 bought another 1,931,102 shares of Lattice, bringing their total then to nearly 6.2 million shares. After the last of these purchases, Yin wrote to Chow,

14

congratulating him on the successful launch of his new fund, saying, "I ordered a couple bottles of wines for you from" Hong Kong, and asking him where he would like them delivered. (GX-1003T, at 10.)

On November 3, before the NASDAQ opened for trading, Lattice announced the agreement for its acquisition by Canyon Bridge. On that day, the Yin Accounts sold more than 3.73 million shares of Lattice, *i.e.*, about half their position.

Peter Melley, director of FINRA's Criminal Prosecution Assistance Group, testified, in sum, that in the seven months prior to July 2016, there were only eight days on which any of the five Yin Accounts traded in Lattice shares. In the four months from July 5 through November 2, one or more of those accounts bought shares of Lattice on 33 days. (*See* Tr. 636.) As summarized by FBI Special Agent Walthers, the Yin Accounts' position in Lattice went from some 34,000 shares on June 21 to 282,182 shares on July 5, immediately after the meeting between Yin and Chow. Between July 5 and November 2, the Yin Accounts invested $43,070,574 for 7,042,714 shares of Lattice. Melley calculated that Yin's November 3 sale of about half of the Yin Accounts' shares made him a profit of more than $5 million.

### 3. *The Matter of Venue*

Government witnesses including FINRA's Melley and Joseph Brennan, a managing director in the client services division of Depository Trust & Clearing Corporation ("DTCC"), also described administrative aspects of Yin's trades in Lattice stock that took place in Manhattan. Melley testified that Lattice's stock is traded on the NASDAQ, which is headquartered in Manhattan, in the Southern District of New York. Although the NASDAQ is an electronic exchange and no witness was able to say with certainty whether its servers that execute trades were located in New York or New Jersey, there was ample evidence that a material number of Yin Account purchases of Lattice stock were completed through brokers and other service providers in Manhattan.

Melley testified that his review of the Yin Accounts' purchases of Lattice stock between July 2016 and February 2017 revealed that each count of the indictment involved at least one Yin purchase of Lattice shares in which the broker for the seller was Merrill Lynch, which is headquartered in Manhattan. He testified that for the relevant trades, Merrill Lynch's "clearing services are located here in Manhattan." (Tr. 659; *see also id*. at 646-48.)

16

Brennan described clearing and other administrative services performed by DTCC with respect to the trading of stocks on the NASDAQ. He testified that after a trade has been "execut[ed]"--*i.e.*, a buyer of shares of a particular stock has been matched with a seller of such shares--that information is sent to DTCC, whose subsidiaries include NSCC Clearing Corp. ("NSCC") (*see* Tr. 812). Clearance refers to the post-execution reporting and recording of trades, in order to reflect the changing ownership of stocks on a daily basis. Settlement is the process by which money is exchanged for the transfer of the securities. Melley testified that both settlement and clearing are "[a]bsolutely" "necessary part[s] of any trade." (Tr. 673.)

Brennan testified that DTCC, through NSCC, clears trades for the NASDAQ in Manhattan. He testified that information from "every trade that's submitted to the NSCC" is stored on databases in NSCC's facility in Manhattan (Tr. 813), and that all of the Yin Accounts' trades in Lattice stock were "cleared by the NSCC" (*id*. at 816). The clearing data for Yin's trades in Lattice stock were at some point stored on NSCC's Manhattan server. (*See id*. at 822-23.)

B. *The Jury Charge and the Verdict*

After the government ended its presentation of evidence, Chow moved unsuccessfully, pursuant to Fed. R. Crim. P. 29(a), for a judgment of acquittal on the ground that the government had failed to prove (a) that he breached any duty of trust and confidence; (b) that any information he provided to Yin was material or nonpublic; or (c) that he received any personal benefit from providing information to Yin. He also moved unsuccessfully to dismiss the indictment on the ground of improper venue.

Over various objections by Chow, the district court instructed the jury that a person who has gleaned inside information pursuant to his position of trust and confidence violates federal laws against insider trading if he misappropriates that information by "giving it to a third person whom he wants to benefit" (Tr. 1508). The court also instructed that a person need not work for, or on behalf of, a given company to be considered an "insider" for the purposes of those laws. (*Id*.) It stated that in order to find Chow guilty of insider trading, the jury must find that the government had proved beyond a reasonable doubt:

> One, that [Chow] owed a duty of trust and confidence to Lattice;

Two, that [Chow] obtained information about Lattice;

Three, that the information in question was material and nonpublic;

Four, that [Chow] violated a duty of trust and confidence by disclosing this information to Michael Yin;

Five, that [Chow] expected that Mr. Yin would use this information to trade securities or to cause others to trade securities and that Mr. Yin did, in fact, use that information to trade; and

Six, that [Chow] in providing this information to Mr. Yin, anticipated receiving a personal benefit of some kind in return.

(*Id*. at 1509.)  As to the first element of duty, the court told the jury, over Chow's vigorous objection, that

as a matter of law . . . an express agreement to keep certain information confidential gives rise to a duty of trust and confidence between the parties to that agreement, with respect to the information protected by that agreement.

(*Id*.)  As to the question of personal benefit, the court stated that such a benefit could include a "*quid pro quo* exchange of information, maintaining a useful networking contact, or improving [Chow's] reputation in a way that it will translate into obtaining future financial or business benefits," and that personal benefit encompasses the

disclosure of "inside information with an intention to benefit the recipient." (*Id*. at 1512.)

As to venue, the court explained that, for each count, the government needed to prove--by a preponderance of the evidence--that "at least one act in furtherance of the charge occurred in the Southern District of New York." (*Id*. at 1521.) The court instructed that "[i]t is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this district," that that act "need not have been taken by Mr. Chow, so long as the act was part of the crime that you find Mr. Chow committed" and that that act "could include, for example, processing or executing the securities trade within this district." (*Id*.)

After little more than a day of deliberations, the jury found Chow guilty on eight counts: one count of conspiracy to commit securities fraud, one count of securities fraud, and six counts of insider trading with respect to the Yin Accounts' purchases in the following days or periods of 2016: July 5, July 13-22, August 10, September 13-15, September 22 through October 12, and October 17-24. The jury found Chow not guilty on six other counts of insider trading, relating to the Yin Accounts' purchases on July 29 through August 1, August 17, September 9, September 16, November 1, and November 2.

The court sentenced Chow principally to concurrent three-month terms of imprisonment on each count, to be followed by two years of supervised release. This appeal followed.

## II. DISCUSSION

On appeal, Chow contends principally that the government failed to prove that he owed Lattice a duty sufficient to implicate principles of insider trading and that the district court erred in instructing the jury that the nondisclosure agreements he signed created such a duty as a matter of law. He also contends that the government failed to prove that he intentionally breached the NDAs, that he disclosed any information that was material and nonpublic, or that in disclosing any information to Yin he sought or received any personal benefit; that insufficiency of the evidence to establish insider trading also requires reversal of his convictions for securities fraud and conspiracy to commit such fraud because the government failed to prove the existence of an agreement to commit insider trading or the existence of a scheme or artifice to defraud; and that the government failed to carry its burden of establishing venue.

21

We consider sufficiency challenges to a jury verdict by "view[ing] the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) ("*Martoma*"), *cert. denied*, 139 S. Ct. 2665 (2019) (internal quotation marks omitted).  We view the evidence as a whole rather than "piecemeal"; and "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [we] must let the jury decide the matter," *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019) (internal quotation marks omitted).  These principles apply whether the evidence being reviewed is direct or circumstantial.  *See, e.g., Glasser v. United States*, 315 U.S. 60, 80 (1942), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987).  Thus, we must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Given these principles, we see no basis for disturbing the jury's determination of Chow's guilt.

22

A. *Insider Trading*

Prosecutions for alleged insider trading are generally brought, as here, under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5. Section 10(b) provides, in pertinent part, that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 clarifies the meaning of "manipulative or deceptive device" in relevant part by stating that

> [i]t shall be unlawful for any person, directly or indirectly . . . ,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> . . . or

23

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 10(b) "as written, does not confine its coverage to deception of a purchaser or seller of securities . . . ; rather, the statute reaches any deceptive device used '*in connection with* the purchase or sale of any security.'" *United States v. O'Hagan*, 521 U.S. 642, 651 (1997) (emphasis ours).

1. *The Duty*

As the Court discussed in *O'Hagan*, these provisions prohibit two types of insider trading, originally having been applied to company officials or employees ("insiders") who take advantage of material nonpublic company information to enter into securities transactions with persons lacking such information, and later being viewed as encompassing also persons who are not insiders but who nonetheless owe a duty of nondisclosure to the company and who misappropriate its confidential information for securities-trading purposes:

> Under the "traditional" or "classical theory" of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the

24

basis of material, nonpublic information. Trading on such information qualifies as a "deceptive device" under § 10(b), we have affirmed, because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Chiarella* v. *United States*, 445 U.S. 222, 228 (1980). That relationship, we recognized, "gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders.'" *Id.*, at 228-229 (citation omitted). The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation. See *Dirks* v. *SEC*, 463 U.S. 646, 655, n. 14 (1983).

*The "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. . . .* Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, *the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.*

*O'Hagan*, 521 U.S. at 651-52 (emphases ours).

"The misappropriation theory is thus designed to protec[t] the integrity of the securities markets against abuses by 'outsiders' to a corporation who have

25

access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *Id*. at 653 (other internal quotation marks omitted). Accordingly,

> misappropriation, as just defined, satisfies § 10(b)'s requirement that chargeable conduct involve a "deceptive device or contrivance" used "in connection with" the purchase or sale of securities. . . . [M]isappropriators . . . deal in deception. *A fiduciary who [pretends] loyalty to the principal while secretly converting the principal's information for personal gain, . . . "dupes" or defrauds the principal*.

*Id*. at 653-54 (other internal quotation marks omitted) (emphases ours). The misappropriation theory is "well tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." *Id*. at 658.

The Court's express approval of the misappropriation theory in *O'Hagan* was presaged by its discussion in *Dirks v. SEC*, 463 U.S. 646 (1983). *See, e.g., O'Hagan*, 521 U.S. at 662 ("*Dirks* . . . left room for application of the misappropriation theory in cases like the one we confront"). *Dirks* stated that

> [u]nder certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such

26

persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. . . . *When such a person breaches his fiduciary relationship, he may be treated more properly as a tipper than a tippee.  See Shapiro* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F. 2d 228, 237 (CA2 1974) (investment banker had access to material information when working on a proposed public offering for the corporation).  *For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.*

*Dirks*, 463 U.S. at 655 n.14 (emphases added).

In keeping with the observations in *Dirks* and the holding in *O'Hagan*, SEC Rule 10b5-2, promulgated in 2000, provides that, "[f]or purposes of [§ 10(b)], *a 'duty of trust or confidence' exists*," among other times, "*[w]henever* a person agrees to maintain information in confidence."  17 C.F.R. § 240.10b5-2(b)(1) (emphases added).

We have characterized individuals who enter into such confidentiality agreements, pursuant to which they are given access to company information that they agree not to disclose, as "'temporary insiders,'" *United States v. Kosinski*, 976 F.3d 135, 144 (2d Cir. 2020) ("*Kosinski*") (quoting *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991) (en banc) ("*Chestman*"), *cert. denied*, 503 U.S. 1004 (1992)), *petition for cert. filed*, No. 20-1161 (U.S. Feb. 23, 2021); and, when all other elements were proven, we

27

have upheld their convictions for insider trading, *see, e.g.*, *United States v. Afriyie*, 929 F.3d 63, 68 (2d Cir. 2019) (noting that "[a]n express agreement of confidentiality may establish fiduciary status" (citing *Chestman*, 947 F.2d at 571)), *cert. denied*, 140 S. Ct. 1228 (2020); *Martoma*, 894 F.3d at 69 (duty of trust and confidence established by a consulting contract prohibiting disclosure of confidential information); *United States v. Falcone*, 257 F.3d 226, 234-35 (2d Cir. 2001) ("*Falcone*") (duty established by tacit understanding between entities at adjacent levels of a magazine's distribution chain that confidentiality was required).

Consistent with the above authorities--and contrary to Chow's contention that the misappropriation theory cannot be applied where the company and the individual have an arm's-length relationship--we have most recently applied the principles of insider misappropriation in *Kosinski*, 976 F.3d at 145-46, in which Kosinski, president of a clinical research firm, was the principal investigator for the conduct of clinical trials for a new drug developed by a pharmaceutical company. Shortly after signing an initial nondisclosure agreement, Kosinski began buying stock in the pharmaceutical company. A second agreement he signed required him, *inter alia*, "to maintain in 'strict confidence' all the information with which he was provided to enable him to perform as principal investigator." *Id*. at 140. During the clinical trial

28

period, when Kosinski received a weekend email alerting him that several patients in the trial had recently suffered allergic reactions, Kosinski quickly sold all of his stock in the company before the information became public. We upheld his conviction for insider trading on the misappropriation theory, noting, *inter alia*, that his "'explicit acceptance of a duty of confidentiality'" was itself sufficient to establish the fiduciary duty of trust and confidence that subjected his conduct to penalties for insider trading. *Id*. at 146 (quoting *Falcone*, 257 F.3d at 234). We "reject[ed] the argument that Kosinski could not have been a fiduciary because he dealt with [the pharmaceutical company] at 'arm's-length.'" *Kosinski*, 976 F.3d at 148.

In the present case, there is no dispute that Chow signed two nondisclosure agreements with Lattice; that in both NDAs each party agreed not to disclose any confidential or proprietary information of the other; and that "[t]he fact of the [Parties'] exploration and evaluation of" the potential acquisition of Lattice was explicitly classified as "Proprietary Information" that was to remain "Confidential" (GX-849, ¶ 1; GX-848, ¶ 1). Chow's contention that it was error for the district court to instruct the jury that such agreements meant that Chow had a duty of nondisclosure as a matter of law is meritless. Rule 10b5-2 itself states, for purposes

29

of § 10(b), that "[w]henever a person agrees to maintain information in confidence," "a 'duty of trust or confidence' exists."  17 C.F.R. § 240.10b5-2(b)(1).

2. *Evidence of Intentional Disclosure of Material Information*

Chow also argues that there was insufficient evidence to support an inference that he in fact disclosed material, nonpublic information to Yin.  Repeating arguments he presented to the jury  unsuccessfully, he maintains that the circumstantial evidence of breach is equally consistent with the innocent explanation that he "spoke to Yin only generally about his business activities, as permitted by the NDAs, and that Yin traded only on the *hypothesis* that Chow was pursing a Lattice deal." (Chow brief on appeal at 34-35 (emphasis in brief).)  Chow also insists that any tips provided to Yin were limited to his own thinking--"information concerning the extent to which Chow was pursuing the acquisition"--which he maintains fell beyond the reach of the confidentiality agreements.  (*Id*. at 21.)  We are not persuaded.

Although Chow argued that he and Yin never worked together and they "hardly knew each other until late March 2016, when Mr. Yin reached out to" Chow because Chow "had suddenly arrived in the position of power" (Tr. 1397-98), the jury was not required to credit that argument.  Chow's phone showed that he had known

30

Yin since at least 2011. It also indicated that Chow had a strong interest in being able to communicate with Yin: His phone had five numbers stored for Yin.

The record also shows explicitly that Chow more than once revealed not just his own thoughts but described the progress of merger negotiations. For example, on August 10 Chow told Yin that Chow could not come back to Beijing because he was "making a deal." (GX-1003T, at 5.) And on September 21, Chow told Yin that they would be "signing the contract soon." (*Id*. at 9.) These express references to actions that are inherently multilateral belie Chow's claim that he disclosed only his own views and interests without--in violation of his duty of confidentiality--indicating the existence and progress of negotiations. Such information is plainly material to an investor, and by these statements Chow expressly informed Yin that negotiations were going well.

Other evidence--viewed as a whole rather than piecemeal--permitted the inference that Yin knew from the outset that the company Chow was attempting to acquire was Lattice. On July 12, Yin offered to introduce Chow to a "CFIUS related lawyer"--indicating Yin's understanding that Chow was seeking to acquire a United States company (*id*. at 3.) Yin's knowledge as to the company's whereabouts within the United States was reflected in, *inter alia*, his July 12 request of the Jefferies

investment bankers that they introduce Chow to their semiconductors analyst, stating that in the United States for the next three weeks Chow would be "mainly [on the] west coast" (GX-1088).  Yin's knowledge of the company's precise product line was reflected in a subsequent voice message to Chow referring to CFIUS-approval concerns about "the company that does FPGA" (GX-1003T, at 9).  And Yin specifically identified Lattice as that company in his text to an associate saying that Yin's "friend" had recently reported making progress with "LSCC"--the NASDAQ symbol for Lattice (GX-1007T, at 2; *see* Tr. 843).  Further, that text by Yin predicted that there could be a deal by "mid-October" (GX-1007T, at 2; *see* Tr. 843), from which it can be inferred that Yin was also aware of the nonpublic fact that Lattice had granted Canyon Bridge exclusivity until October 18.

Most importantly, the jury was entitled to take into account the "timing of the men's contacts relative to . . . trading," *United States v. Riley*, 638 F. App'x 56, 61 (2d Cir.) ("*Riley*"), *cert. denied*, 137 S. Ct. 589 (2016).  For example, the record suggests that there were no contacts between Chow and Yin in 2016 from the time of their meeting in March until July.  Then on July 5--two days before China Reform would make its first offer to Lattice--Chow texted Yin to set up a meeting.  The two men met that day in Beijing; and shortly after the NASDAQ opened for trading that day, the

32

Yin Accounts--whose position in Lattice stock at the start of the day was fewer than 34,000 shares--bought 248,268 shares. And in the period July 13-22, they bought an additional 280,283 shares.

On August 8, Lattice and China Reform had entered into their exclusivity agreement. On August 10, Chow sent Yin a text message saying he was "making a deal" (GX-1003T, at 5); and 13 seconds after the NASDAQ next opened, Yin began buying an additional 120,000 Lattice shares (*see* GX-1517D).

On September 13, Canyon Bridge sent Lattice a first draft of a merger agreement--an "important step" toward the proposed merger (Tr. 237). Yin had texted Chow on September 12 and suggested that they meet in Beijing on September 13. They did, and on September 13, minutes after the NASDAQ opened for trading, the Yin Accounts bought more than 100,000 shares of Lattice. And the Accounts proceeded through September 15 to buy nearly 800,000 more shares. The permissible inference from this sequence itself--that Yin had bought those shares on the basis of material information received in his meeting with Chow on the eve of Canyon Bridge's presenting Lattice with a draft merger agreement--was strengthened by Yin's texting an associate on September 16 that Yin's "friend . . . recently said that LSCC's project is moving forward" (GX-1007T, at 2).

33

On September 21, Yin sent Chow a voice message suggesting there might be concern that Lattice's acquisition by a Chinese company would not be approved by CFIUS.  But when Chow's prompt response was "[w]e should already be signing the contract soon," the Yin Accounts proceeded, from September 22 through October 12, to buy 2,206,760 more shares of Lattice stock.

On October 17, one day before Canyon Bridge's period of exclusivity was due to expire, Yin contacted Chow to arrange a meeting, and the two met that day. On October 18, after Chow called Billerbeck to request an extension of the exclusivity agreement, Lattice extended the exclusivity period to October 26.  And from October 17 through 24, the Yin Accounts bought another 1,931,102 shares.

Chow was highly educated and experienced, not seemingly likely to make disclosures of material information inadvertently--especially as to information that was expressly classified as confidential in the two nondisclosure agreements he signed.  He would be expected to know that facts such as the making of a merger offer, or an agreement on an exclusivity period, or the transmittal of a first draft of a merger agreement, or the imminence of a final contract would be material information to an investor.  In light of the evidence as to his position and business experience, it was permissible for the jury to infer that Chow intentionally disclosed

information to Yin about the existence and progress of his acquisition discussions with Lattice given, *inter alia*, the frequency of the communications between Chow and Yin during the four months of Chow's negotiations with Lattice, especially in contrast to the prior lengthy periods when Chow and Yin apparently had had no contact; the manifest significance of the information Yin gained from those communications, followed by his large purchases of Lattice shares; and the facts that the very first meeting of that four-month period, precipitating Yin's buying spree of Lattice shares, occurred just two days before China Reform would make its first offer to Lattice, and was initiated by Chow.

The jury was entitled to infer that Yin's investment of so many millions of dollars to buy Lattice stock immediately after communications with Chow was based on material, nonpublic information he received from Chow, not on just a "*hypothesis*."

3. *Personal Benefit*

The requirement to show that the tipper benefited, in order to establish his liability for insider trading, was explored at length in *Martoma*. We noted that in *Dirks*, the Supreme Court stated that a key question as to "whether there has been a

35

breach of the tipper's duty 'is whether the [tipper] personally will benefit'" from the disclosure--either "'directly or indirectly.'" *Martoma*, 894 F.3d at 67-68 (quoting *Dirks*, 463 U.S. at 662). And we noted that

> *Dirks* set forth several personal benefits that could prove the tipper's breach, including, for example, "a relationship" between the tipper and tippee "that suggests a *quid pro quo* from the latter," the tipper's "intention to benefit" the tippee, and "a gift of confidential information to a trading relative or friend" where "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." [463 U.S.] at 664 . . . .

*Martoma*, 894 F.3d at 68. Accordingly, "[w]e have applied *Dirks* to uphold a wide variety of personal benefits," including finding

> evidence of a personal benefit sufficient where the tippee gave one tipper "an iPhone, live lobsters, a gift card, and a jar of honey," and where the tippee had another tipper admitted into an investment club where the tipper "had the opportunity to access information that could yield future pecuniary gain" (even though he never realized that opportunity).

*Martoma*, 894 F.3d at 74 (quoting *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)).

We further noted our holding in an SEC civil enforcement action that "the government 'need not show that the tipper expected or received a specific or tangible benefit in exchange for the tip,' and that the personal benefit element is satisfied where there is evidence that the tipper 'intend[ed] to benefit the . . . recipient.'"

*Martoma*, 894 F.3d at 74 (quoting *SEC v. Warde*, 151 F.3d 42, 48 (2d Cir. 1998) (other internal quotation marks omitted)).  We concluded that

> as is clear from the purpose of the personal benefit element, the "broad definition of personal benefit set forth in Dirks," and the variety of benefits we have upheld, the evidentiary "bar is not a high one."

*Martoma*, 894 F.3d at 76 (quoting *SEC v. Obus*, 693 F.3d 276, 292 (2d Cir. 2012)).

In the present case, as quoted in Part I.A.2. above, Canyon Bridge's response to the March 2017 inquiry from FINRA included the information that Chow had asked Yin to provide him with analyst reports on the semiconductor industry, and that Chow had asked Yin to recommend possible limited partners for Chow's venture.  And the record includes evidence that Yin provided Chow with information on other manufacturers of FPGAs and on users of FPGAs; and that Yin used his contacts with two Jefferies investment bankers to connect Chow with a Jefferies analyst knowledgeable about FPGAs, and to link those investment bankers with Chow's fund for profitable undertakings. Yin also sent Chow gifts of wine and cigars.

The repeated confluence of the Chow-Yin communications and large purchases of Lattice stock by Yin--the first of which followed contact initiated by Chow after a months-long period of no communication between the two men--also

37

permitted the inference that Chow intended that Yin would make purchases of Lattice shares based on the information he received from Chow. The jury was entitled to infer that Chow did not inadvertently or

accidentally disclose to Yin on July 5 that China Reform was about to make an offer to Lattice (following which Yin bought 528,551 shares),

or accidentally tell Yin on August 10 that he was "making a deal" (following which Yin bought 120,000 shares),

or accidentally disclose on September 13 that Canyon Bridge was giving Lattice a draft merger agreement that day (following which Yin bought 913,198 shares),

or accidentally tell Yin on September 21 that we "should already be signing the contract soon" (following which Yin bought 2,206,760 shares),

or accidentally reveal to Yin on October 17 that the October 18 exclusivity period would likely be extended (following which Yin bought 1,931,102 shares).

Given the record as a whole, we conclude that the evidence was sufficient to support inferences that Chow knowingly and intentionally breached his duty of confidentiality by disclosing material nonpublic information as to the prospects for a merger agreement between Lattice and Chow's fund, intending for Yin to make trades based on that information. The evidence was sufficient to support the jury's verdict of Chow's guilt of insider trading.

38

B. *Securities Fraud and Conspiracy*

In light of the above, Chow's challenges to his convictions for securities fraud and conspiracy to commit such fraud also fail.  "A fiduciary who [pretends] loyalty to the principal while secretly converting the principal's information for personal gain, . . . 'dupes' or defrauds the principal."  *O'Hagan*, 521 U.S. at 653-54 (other internal quotation marks omitted).

The above evidence, including the timing of the communications between Chow and Yin relative to Yin's trading in Lattice stock on and after July 5, supported the jury's verdict that the two men agreed upon, and intentionally executed, a scheme to trade in Lattice's stock based on material nonpublic information in violation of the Exchange Act, and in violation of 18 U.S.C. §§ 371 (conspiracy) and 1348 (securities fraud).

C. *Venue*

A defendant in a criminal case has the right to be tried in the "district wherein the crime shall have been committed."  U.S. Const. amend. VI; *see* Fed. R. Crim. P. 18.  The Exchange Act provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation

occurred." 15 U.S.C. § 78aa. "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985). Rather, venue is proper "in any district in which such [an] offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see, e.g., United States v. Svoboda*, 347 F.3d 471, 482 (2d Cir. 2003) ("*Svoboda*"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989) ("*Beech-Nut*"). However, venue must be proper with respect to each count. *See, e.g., United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) ("*Tzolov*"); *Beech-Nut*, 871 F.2d at 1188.

The government has the burden of proving proper venue; but as venue is not an element of the crime, such proof need only be by a preponderance of the evidence. *See, e.g., Tzolov*, 642 F.3d at 318; *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008), *cert. denied*, 558 U.S. 935 (2009); *Beech-Nut*, 871 F.2d at 1188; *Riley*, 638 F. App'x at 61.

Chow's challenge to venue in the Southern District of New York (or "SDNY")--which includes Manhattan--is foreclosed by the established law of this Circuit. Where the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is

40

appropriate. *See, e.g.*, *Svoboda*, 347 F.3d at 483 (holding venue in the SDNY proper although the defendant's only contacts with the district were trades executed on New York-based securities exchanges, because the "savvy investor" could reasonably foresee that trades likely would be executed on such exchange); *United States v. Geibel*, 369 F.3d 682, 697-98 (2d Cir. 2004) (rejecting challenge to SDNY venue on counts involving purchases of options executed on the American Stock Exchange located and headquartered in the SDNY); *Riley*, 638 F. App'x at 62 (holding venue in the SDNY proper because the defendant "could have foreseen that the trading that would result from his communication of inside information to [his tippee] would occur in the Southern District of New York, given that [his company's] shares were publicly traded on NASDAQ, located in Manhattan").

As described in Part I.A.3. above, the evidence at trial included testimony and documentary evidence that the Southern District of New York is the district in which the NASDAQ is located, where the shares of Lattice stock were listed and traded, where the brokers for the sellers in a significant number of Yin's Lattice share purchases were located, and where Yin's purchases of Lattice shares were executed, cleared, and recorded. Regardless of where Yin's purchases of Lattice shares were

initiated, the evidence showed that those transactions were continued and/or completed in the Southern District of New York.

Chow led, first, the China Reform team, and then the Canyon Bridge team, in the due diligence process required for exploring the possible acquisition of Lattice and making several nonbinding offers to buy Lattice's shares. Chow's college and postgraduate degrees include a Master's Degree in business. The jury was entitled to infer that he would have been aware that the shares of Lattice were listed and traded on the NASDAQ stock exchange, which was in Manhattan.

## III. CONCLUSION

We have considered all of Chow's arguments and have found in them no basis for reversal. The judgment is affirmed.