19-197 (L)
*United States v. Korchevsky*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: FEBRUARY 11, 2020
DECIDED: JULY 19, 2021

Nos. 19-197-cr, 19-780-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

VLADISLAV KHALUPSKY, VITALY KORCHEVSKY,
*Defendants-Appellants.**

————

Appeal from the United States District Court
for the Eastern District of New York.

————

Before: WALKER, PARKER, and CARNEY, *Circuit Judges.*

————

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

For years, defendants-appellants Vladislav Khalupsky and Vitaly Korchevsky used information from stolen, pre-publication press releases to execute advantageous securities trades. Their trading was facilitated by intermediaries who paid hackers for the stolen press releases, provided the releases to Khalupsky and Korchevsky, and funded brokerage accounts for them to use in trades. Ultimately, the defendants' illicit trades netted profits in excess of $18 million.

Following a jury trial in the United States District Court for the Eastern District of New York (Raymond J. Dearie, *J.*), Khalupsky and Korchevsky were convicted of conspiracy to commit wire fraud, conspiracy to commit securities fraud and computer intrusions, securities fraud, and conspiracy to commit money laundering. They now appeal, contending that the evidence was insufficient to support conviction, venue was improper on the securities fraud counts, the government's proof at trial constructively amended the indictment, the district court erred by instructing the jury on conscious avoidance, and the district court erred in how it responded to a jury note. Finding no merit in these arguments, we **AFFIRM** the judgments of conviction.

————

> JULIA NESTOR (Susan Corkery, Richard M. Tucker, David Gopstein, *on the brief*), Assistant United States Attorneys, *for* Jacquelyn M. Kasulis, Acting United States Attorney for the Eastern District of New York, *for Appellee*.

DARRELL FIELDS, Federal Defenders of New York, New York, NY, *for Defendant-Appellant Vladislav Khalupsky*.

RANDY D. SINGER (Rosalyn Singer, Kevin Hoffman, *on the brief*), Singer Davis, LLC, Virginia Beach, VA; Steven Gary Brill (*on the brief*), Sullivan & Brill, LLP, New York, NY; *for Defendant-Appellant Vitaly Korchevsky*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

For years, defendants-appellants Vladislav Khalupsky and Vitaly Korchevsky used information from stolen, pre-publication press releases to execute advantageous securities trades. Their trading was facilitated by intermediaries who paid hackers for the stolen press releases, provided the releases to Khalupsky and Korchevsky, and funded brokerage accounts for them to use in trades. Ultimately, the defendants' illicit trades netted profits in excess of $18 million.

Following a jury trial in the United States District Court for the Eastern District of New York (Raymond J. Dearie, *J.*), Khalupsky and Korchevsky were convicted of conspiracy to commit wire fraud, conspiracy to commit securities fraud and computer intrusions, securities fraud, and conspiracy to commit money laundering. They now appeal, contending that the evidence was insufficient to support conviction, venue was improper on the securities fraud counts, the government's proof at trial constructively amended the indictment,

the district court erred by instructing the jury on conscious avoidance, and the district court erred in how it responded to a jury note. Finding no merit in these arguments, we **AFFIRM** the judgments of conviction.[1]

# BACKGROUND

In 2010, brothers Arkadiy and Pavel Dubovoy approached Korchevsky, a hedge fund manager and investment advisor, to seek his help implementing a scheme to use nonpublic information to trade on the stock market. The nonpublic information was coming from hackers in Ukraine, who hacked into three newswires (PR Newswire, Marketwired, and Business Wire) that disseminate press releases from publicly traded companies. The hackers obtained the press releases containing crucial financial information before the releases were published. Then, they saved the stolen releases onto a web-based server to which the Dubovoys also had access.

The Dubovoys provided Korchevsky with login credentials to review some of the stolen releases in order to convince him of the nascent scheme's potential. Korchevsky looked at the releases and agreed that advance information of the sort could be traded upon profitably. Accordingly, Arkadiy Dubovoy opened and funded brokerage accounts, in which Korchevsky would trade. Arkadiy's son, Igor Dubovoy, equipped Korchevsky with computers, phones,

---

[1] The resolution of this appeal was held pending resolution of the appeal to this court in *United States v. Chow*, No. 19-325, which in part concerned a related legal issue. *See infra* Part II. *Chow* was decided on April 6, 2021. *United States v. Chow*, 993 F.3d 125 (2d Cir. 2021).

and a software program enabling easy access to the server hosting the stolen releases.

From January 2011 until February 2015, Korchevsky executed advantageous trades using the information in the stolen press releases. In return for trading on Arkadiy's behalf, he received a percentage of the profits. Korchevsky did most of the trading in the window of time after the press release was uploaded to a newswire's internal computer system but before it was publicly disseminated (i.e., trading "in-window"). He then closed on his trading position after the release became public and the market had reacted to its contents. During the scheme, Korchevsky ultimately amassed roughly $15 million in net profits—a 1,660% return on investment—in Arkadiy's brokerage accounts.

The Dubovoys eventually decided to bring in another trader, Khalupsky. Khalupsky owned a trading company in Ukraine and used its employees to conduct trading as part of the charged scheme. As with Korchevsky, the Dubovoys shared the stolen releases with Khalupsky, funded brokerage accounts in Arkadiy's name, and paid Khalupsky a piece of the profits. These trades, too, were generally initiated in-window. The Khalupsky trades yielded roughly $3.1 million in net profits during the scheme.

The scheme faltered for a time after the relationship with the hackers soured. Arkadiy had opened additional brokerage accounts unknown to the hackers in order to exclude them from some of the profits. The hackers grew suspicious and, in early 2014, stopped sending stolen press releases to the Dubovoys. Without access to the

nonpublic information, Korchevsky's trading volume and profits plummeted.

By late 2014, the Dubovoys found another Ukrainian hacker who could steal pre-publication press releases. This new hacker charged more for the service, however, so the Dubovoys questioned whether the arrangement would still be worthwhile. Korchevsky insisted that the Dubovoys secure this new source of press releases. They did, and the scheme continued, albeit in modified form. Rather than trading directly out of Arkadiy's brokerage accounts, Korchevsky now received the stolen press releases from Igor, reviewed them, and sent him a coded text message telling him how much of which stocks he should purchase. The scheme continued into 2015.

On August 15, 2015, a grand jury returned the first indictment in this case, charging Khalupsky and Korchevsky with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count Two); securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Counts Three and Four); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Five). On September 13, 2016, a second grand jury returned a superseding indictment, replicating the first one but adding computer intrusions as an object of the conspiracy to commit securities fraud charge in Count Two.

Following a three-week jury trial that concluded in July 2018, Khalupsky and Korchevsky were convicted on all counts. The district court sentenced Khalupsky to four years' imprisonment to be followed by two years' supervised release, and ordered him to forfeit

$397,281.12 and pay $339,062.99 in restitution. It sentenced Korchevsky to five years' imprisonment to be followed by three years' supervised release, and ordered him to forfeit $14,452,245 and pay $339,062.99 in restitution. This appeal followed.

## DISCUSSION

Korchevsky's principal argument on appeal is that the evidence was insufficient to establish his participation in the single charged conspiracy with Khalupsky. Korchevsky also argues that: the evidence was insufficient to support the securities fraud convictions; venue was improper in the Eastern District of New York (EDNY) for the securities fraud counts (an argument Khalupsky joins); the proof at trial constituted either a constructive amendment of the superseding indictment or prejudicial variance from it; and the district court erred by giving a particular exhibit to the jury in response to a note during deliberations. Khalupsky additionally asserts that the district court erred in charging the jury on conscious avoidance (an argument Korchevsky joins in his reply brief). Each of the defendants also adopted the arguments of the other pursuant to Federal Rule of Appellate Procedure 28(i). None of the arguments of either defendant, however, is persuasive.

### I.       Sufficiency of the Evidence

Korchevsky challenges the sufficiency of evidence in support of both his conspiracy convictions and his substantive securities fraud convictions. In challenging the sufficiency of the evidence, Korchevsky "face[s] a heavy burden, as the standard of review is

exceedingly deferential to the jury's apparent determinations."[2] "[W]e view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor."[3]  When the sufficiency challenge is to a conspiracy conviction, "deference to the jury's findings is especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court."[4]  We will uphold the challenged convictions if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[5]  Here, we find no basis to disturb the convictions.

A. Conspiracy

To challenge his conspiracy convictions, Korchevsky makes the following argument: co-conspirators must know one another, but the evidence established that he did not know Khalupsky, so the evidence cannot support his participation in one conspiracy with Khalupsky.[6] This argument fails because its premise is incorrect.  Korchevsky and Khalupsky need not have known one another to be co-conspirators.

---

[2] *United States v. Flores*, 945 F.3d 687, 710 (2d Cir. 2019) (internal quotation marks omitted).

[3] *Id.* (internal quotation marks omitted).

[4] *Id.* (internal quotation marks and alteration omitted).

[5] *Id.*

[6] Korchevsky also argues that, because he could not have been Khalupsky's co-conspirator, he suffered spillover prejudice by being tried jointly with Khalupsky.  Because we find that the defendants were co-conspirators, we have no occasion to address this argument.

The evidence was sufficient to support the defendants' knowing participation in a single conspiracy.

"Whether the government has proved a single or multiple . . . conspiracies is a question of fact for a properly instructed jury."[7]  To prove conspiracy, "the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent."[8]  It must "show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal."[9]  But "[t]he government need not show that the defendant knew all of the details of the conspiracy," "[n]or must the government prove that the defendant knew the identities of all of the other conspirators."[10]  That is "especially [true] where the activity of a single person was central to the involvement of all" conspirators.[11]  "Indeed, a defendant may be a co-conspirator if he knows only one other member of the conspiracy . . . ."[12]

---

[7] *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) (internal quotation marks omitted).  The jury in this case was instructed only on the possibility of a single conspiracy, not on multiple conspiracies.  Korchevsky does not challenge that decision on appeal.

[8] *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) (collecting cases).

[9] *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) (internal quotation marks omitted).

[10] *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008); *see also Sureff*, 15 F.3d at 230 ("A single conspiracy may encompass members who neither know one another's identities nor specifically know of one another's involvement." (citations omitted)).

[11] *Maldonado-Rivera*, 922 F.2d at 963 (internal quotation marks omitted).

[12] *Huezo*, 546 F.3d at 180.

Korchevsky contends that he was a member of one conspiracy with the Dubovoys, while Khalupsky was a member of an entirely separate conspiracy with the Dubovoys.  To suggest that his view of the evidence is the only reasonable one, Korchevsky relies on the following brief passage of Arkadiy's direct testimony:

> Q:    You were intentionally trying to keep [Khalupsky and Korchevsky] away from each other?
>
> A:    Yes. . . . We wanted to see who was better at trading.[13]

But this exchange does not compel the conclusion Korchevsky seeks. To the contrary, the testimony indicates that Arkadiy kept Khalupsky and Korchevsky apart precisely because doing so furthered the common goal of the conspiracy: to maximize profits by successfully trading on information from the stolen press releases.  That Khalupsky's and Korchevsky's individual goals were limited in scope to their own trading activity is irrelevant.  Co-conspirators' goals "need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes."[14]

Upon review of the full record, we have no doubt that the evidence was sufficient to support the conspiracy convictions.  It is clear that Korchevsky not only "agreed to participate in what he knew to be a collective venture directed toward a common goal,"[15] but also "had reason to know that in dealing with" the Dubovoys he "w[as]

---

[13] App. at 351–52.

[14] *Maldonado-Rivera*, 922 F.2d at 963.

[15] *Id.* (internal quotation marks omitted).

involved with a larger organization."[16]  For example, the first time Arkadiy and Korchevsky met, Arkadiy told him that he would be trading on information originally coming from an unnamed group of Ukrainian hackers, with everybody doing their part in return for a percentage of the profits.  Separately, Igor and Korchevsky discussed what portion of earnings was paid to the hackers and the fact that there was an additional intermediary between the hackers and the Dubovoys also taking a cut.

Faced with this evidence, Korchevsky argues that the record at most shows his awareness of other upstream co-conspirators, but fails to support his awareness of a co-conspirator similarly situated to Khalupsky.  His argument is unavailing because our precedent does not require that level of specific awareness.  In *United States v. Sureff*, we affirmed the defendant's conviction for a single drug dealing conspiracy even though there was no evidence that her two retailer partners—participants in the charged single conspiracy—were aware of one another's existence.[17]  The retailers nevertheless had the required awareness that "they were involved with a larger organization" because each knew that the defendant was working with "the bank" upstream from the retail operations.[18]  There is no relevant distinction between the awareness the retailers in *Sureff* each had of the defendant and her upstream co-conspirators and the awareness Khalupsky and Korchevsky each had about the Dubovoys and the hackers.

---

[16] *Sureff*, 15 F.3d at 230.

[17] 15 F.3d at 229–30.

[18] *Id.* at 230.

Korchevsky instead attempts to analogize this case to *United States v. McDermott*,[19] but *McDermott* is inapposite.  In that case, the defendant (McDermott) gave non-public stock information to a woman (Gannon) with whom he was having an affair.[20] Unbeknownst to McDermott, Gannon was simultaneously having an affair with another man (Pomponio) and conveying McDermott's stock recommendations to him.[21]  Pomponio traded on McDermott's information, sharing the profits with Gannon.[22]  McDermott was ultimately tried with Pomponio and convicted as his co-conspirator on the theory that, at least from the perspective of two members of the love triangle, the three of them were working toward "a unitary purpose to commit insider trading."[23]  On appeal, we vacated the conviction because there was "no record evidence suggesting that McDermott's agreement with Gannon encompassed a broader scope than the two of them."[24]  Unlike Korchevsky or the retailers in *Sureff*, McDermott was not aware he was "involved with a larger organization."[25]  He had not agreed that Gannon could "pass [his]

---

[19] 245 F.3d 133 (2d Cir. 2001).

[20] *Id.* at 136.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 137.

[24] *Id.* at 138.  To the extent language in *McDermott* suggests that McDermott would have needed to be aware that "there existed others *similarly situated*" to him in the scheme, it is dicta; we vacated his conviction because he was unaware there was *anybody* other than Gannon involved, regardless of the other person's relationship to Gannon.  *Id.* (emphasis added).

[25] *Sureff*, 15 F.3d at 230.

insider information to . . . another person, even if unknown."[26] Korchevsky, by contrast, knew that he depended on a large network of people to facilitate his illicit trading, and he agreed that the profits he generated would be shared with them.

B.  Securities Fraud

Counts Three and Four charged Khalupsky and Korchevsky with fraudulent trading in securities as corporate outsiders, in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5, promulgated thereunder.  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [, of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe."[27]  Rule 10b-5 prohibits "employ[ing] any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security."[28]

To challenge his convictions on these substantive securities fraud counts, Korchevsky first argues that the government could not prove he engaged in a "scheme or artifice to defraud" within the meaning of Rule 10b-5.  Specifically, he claims the proof necessarily failed because he did not owe a fiduciary duty to investors or potential investors in the companies whose press releases were stolen, and because any deception employed to obtain the releases did not target the investors.  Second, Korchevsky argues that the type of

---

[26] *McDermott*, 245 F.3d at 138.

[27] 15 U.S.C. § 78j(b).

[28] 17 C.F.R. § 240.10b-5.

computer hacking used to access Marketwired's systems—the conduct charged in Count Four—did not constitute a "deceptive device or contrivance" within the meaning of Section 10(b).[29] We are unpersuaded.

First, we dispatch Korchevsky's contention that he did not engage in a "scheme or artifice to defraud." Although a fiduciary duty is relevant to other securities violations—e.g., insider trading— it need not be shown to prove the securities fraud charged here: fraudulent trading in securities by an outsider.[30] Further, Korchevsky's assertion that the deception must have targeted investors contradicts the plain language of Rule 10b-5. The deception need only be "*in connection with* the purchase or sale of any security,"[31] and here it was. The newswire hacking directly prompted and enabled the charged securities trading.[32] Indeed, the ensuing trades needed to occur soon after a press release was illicitly obtained from

---

[29] Korchevsky initially challenged his convictions on both Counts Three and Four on the basis that computer hacking was not "deceptive" within the meaning of Section 10(b). In reply, he abandoned his challenge to his conviction on Count Three, which charged securities fraud in connection with the "spear phishing" hack of PR Newswire's systems. Spear phishing occurs when a hacker sends a misleading email to an account user in order to deceive that user into providing the hacker with his login credentials, often by inducing the user to click on a link that in turn prompts them to enter the credentials. As Korchevsky concedes in reply, spear phishing to obtain credentials and then using the ill-gotten credentials to log in is "deceptive" under Section 10(b). Def.-Appellant Korchevsky's Reply at 21 (citing *S.E.C. v. Dorozhko*, 574 F.3d 42, 44–49 (2d Cir. 2009)).

[30] *See Dorozhko*, 574 F.3d at 46–49.

[31] 17 C.F.R. § 240.10b-5 (emphasis added).

[32] *See S.E.C. v. Zandford*, 535 U.S. 813, 822 (2002) ("It is enough that the scheme to defraud and the sale of securities coincide.").

a newswire's servers, but before the newswire could publish the release, in order to maximize the hacked information's value.

Second, we find that the hack of Marketwired's systems qualified as a "deceptive device or contrivance" under Section 10(b). The hackers initially accessed Marketwired's systems using a technique known as SQL injection. This enabled them to glean the architecture of the hacked computer system, identify vulnerabilities, and extract data. Then, having gained initial access, the hackers extracted employee login credentials and used those credentials to intrude into the system's more secure areas. Regardless of how one might characterize the initial SQL injection technique, the subsequent use of stolen employee login credentials to gain further system access was deceptive. Every time the hackers attempted to access parts of the system by entering stolen credentials, they misrepresented themselves to be authorized users. "[M]isrepresenting one's identity in order to gain access to information that is otherwise off limits, and then stealing that information is plainly 'deceptive' within the ordinary meaning of the word."[33]

Korchevsky cannot carry his heavy burden to overcome the jury's findings and demonstrate that the evidence was insufficient to support conviction on any count.

## II.    Venue

Khalupsky and Korchevsky both argue that there was insufficient evidence to establish venue in the EDNY for the securities fraud counts. We disagree. It was foreseeable to the defendants that

---

[33] *Dorozhko*, 574 F.3d at 51.

acts constituting the securities fraud violations would take place in the EDNY.

The Securities and Exchange Act provides that, for securities fraud, the "criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred."[34] That test is satisfied in any district where "the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur," or where "it is foreseeable to the defendant that such an act would occur . . . and that act does in fact occur."[35] "To be in furtherance of the charged offense, acts or transactions must *constitute* the securities fraud violation—mere preparatory acts are insufficient."[36] "Venue may also be established if the defendant aids and abets another's crime of securities fraud in the district."[37]

The government bears the burden of proving appropriate venue on each count, as to each defendant, by a preponderance of the evidence.[38] Our review is de novo, but we view the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in its favor."[39] In this case, the government

---

[34] 15 U.S.C. § 78aa(a).

[35] *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016) (alteration and internal quotation marks omitted) (quoting *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008), and *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)).

[36] *Id.* (internal quotation marks omitted).

[37] *Id.*

[38] *Chow*, 993 F.3d at 143 (noting that proof is only by a preponderance of the evidence because venue is not an element of a crime); *Lange*, 834 F.3d at 71.

[39] *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (internal quotation marks omitted).

presented an assortment of evidence to establish venue in the EDNY. Viewing this evidence collectively, we agree that venue was proper in the EDNY.

First, evidence suggested the defendants foresaw that some of their trades would be consummated with counterparties in the EDNY. The government's expert confirmed that 175 of the defendants' trades were in fact consummated with counterparties in the EDNY, and that 300 more may have been.[40] This evidence, along with the vast scope of the trading scheme[41] and the defendants' expertise as traders,[42] cumulatively supports the inference that the defendants foresaw the existence of counterparties in the EDNY.

Second, the government introduced evidence that one of Korchevsky's brokerage accounts used J.P. Morgan Clearing Corporation, located in the EDNY, as its clearing agent. The account-opening forms Korchevsky signed listed the J.P. Morgan Clearing Corporation's address. So did the account's monthly statements. The jury was thus entitled to infer that Korchevsky knowingly used an

---

[40] The expert was unable to identify a single precise counterparty for each of these 300 trades, but narrowed down the universe of possible counterparties for each trade to a small number, at least one of which was located in the EDNY. A jury could therefore reasonably infer that, more likely than not, at least some of these 300 counterparties were in fact in the EDNY.

[41] *See Royer*, 549 F.3d at 894 (reasonable for jury to infer that at least one of 300 recipients of the disseminated information would trade on it in the EDNY).

[42] *See Chow*, 993 F.3d at 143–44 (jury could infer from defendant's college and graduate business degrees that he would have been aware shares were listed on the Nasdaq in Manhattan); *Svoboda*, 347 F.3d at 483 (jury could infer that a "savvy investor" would foresee what exchanges his trades would be executed on).

EDNY-based clearing agent for the illicit trades from that account.[43] This evidence also established venue as to Khalupsky by virtue of the aiding and abetting charges. Once proper venue is established in the EDNY for the scheme through Korchevsky, it is enough that Khalupsky "aided and abetted the scheme of securities fraud" writ large; we "do[] not require that a defendant aid and abet the specific criminal activity occurring within the district of venue."[44]

Finally, all of this evidence concerns acts or transactions "constituting" the securities fraud violation, as they must to establish venue, rather than "mere preparatory acts."[45] Counterparties and clearing agents are both "crucial to the success of the scheme."[46] Without them, there would be no completed sale of a security. Accordingly, venue was proper in the EDNY.[47]

---

[43] *Cf. United States v. Geibel*, 369 F.3d 682, 697 (2d Cir. 2004) ("The government failed to establish that defendants' trades . . . utilized the facilities of any . . . securities exchange or brokerage firm" in the venue district, in a case where "the only connection" to the district was that the initial misappropriation of information occurred there.).

[44] *Lange*, 834 F.3d at 73–74.

[45] *Id.* at 69; *see also Chow*, 993 F.3d at 143 (affirming venue in the district where, among other things, the counterparties' brokers were located and "purchases of [the] shares were executed, cleared, and recorded").

[46] *Royer*, 549 F.3d at 895.

[47] Additionally, the government presented evidence about how trades executed on the New York Stock Exchange and the Nasdaq are often processed and settled through a Depository Trust and Clearing Corporation (DTCC) data center located in the EDNY. The government identified at least two of Khalupsky's trades that were in fact cleared through the DTCC. Despite a lack of direct evidence that either Khalupsky or Korchevsky was aware of the DTCC's existence or location, the government urged the jury to infer that traders of their

### III.    Constructive Amendment and Prejudicial Variance

Korchevsky argues that the government's proof at trial either (a) constructively amended the superseding indictment, or (b) prejudicially varied from it. Specifically, he objects to the presentation of three categories of evidence: (1) trades involving target companies that were not identified in the superseding indictment, (2) trades involving press releases hacked from Business Wire, which were not charged in their own securities fraud count, and (3) trades taking place in 2015, even though much of the activity alleged in the indictment took place in 2011–2014. For the reasons below, none of this evidence constructively amended or prejudicially varied from the superseding indictment.[48]

### A. <u>Constructive Amendment</u>

To satisfy the Fifth Amendment's Grand Jury Clause, "an indictment must contain the elements of the offense charged and fairly inform the defendant of the charge against which he must defend."[49] This clause is violated, and reversal is required, if the

---

experience would have been. We need not address this proffered basis for venue in this case, however, because the other evidence in support of venue was sufficient.

[48] The parties dispute whether Korchevsky adequately objected to the government's proof before the district court, and thus dispute the applicable standard of review. Because the standard is irrelevant to our conclusion, we review de novo. *See United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018).

[49] *Id.* at 146 (internal quotation marks and alteration omitted); *see* U.S. CONST. amend. V, cl. 1 ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . .").

indictment has been constructively amended.[50]  "A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted."[51]  A  defendant claiming constructive amendment "must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment."[52]  The charge has been so altered "either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered."[53]  We undertake this inquiry mindful that "courts have constantly permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."[54]  "The core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview."[55]

We do not find a constructive amendment resulting from any of the evidence to which Korchevsky objects.  The trades involving

[50] *Dove*, 884 F.3d at 149.

[51] *Id.* at 146.

[52] *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003).

[53] *Dove*, 884 F.3d at 146 (citations omitted) (first citing *United States v. Miller*, 471 U.S. 130, 138–39 (1985), and then citing *United States v. Agrawal*, 726 F.3d 235, 259 (2d Cir. 2013)).

[54] *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 310 (2d Cir. 2009) (per curiam) (internal quotation marks and emphasis omitted).

[55] *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012) (internal quotation marks omitted).

stocks of other target companies simply served as additional examples of the same conduct constituting the charged scheme.[56] So, too, did proof of the trades in 2015, particularly given that the superseding indictment alleged the scheme persisted into 2015. Korchevsky's argument about the trades resulting from the Business Wire hack is similarly weak. Even though the Business Wire hack was not charged as a standalone securities fraud count, Business Wire was identified as one of the victim newswires in the superseding indictment's introductory section, which was incorporated by reference into all charged counts. In sum, although "not specifically pleaded in the indictment, [these trades] are plainly within the charged core of criminality."[57] None of it was proof of a different kind, setting forth "an additional basis . . . not considered by the grand jury" for conviction.[58]

---

[56] *See Salmonese*, 352 F.3d at 621 (no constructive amendment where indictment alleged twenty-five occasions on which conspirators sold inflated stripped warrants as part of fraud conspiracy, and at trial government proved additional, unalleged sales of stripped warrants).

[57] *Id*. at 621; *see also United States v. Dupre*, 462 F.3d 131, 140–41 (2d Cir. 2006) ("[T]he evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment.").

[58] *Dove*, 884 F.3d at 146. Korchevsky's reliance on *Stirone v. United States*, 361 U.S. 212 (1960), is misplaced for this reason. In *Stirone*, the defendant was charged with violating the Hobbs Act by obstructing interstate *importation* of *sand* destined for use in construction of a steel mill. *Id.* at 217. At trial, the government argued that the defendant had also interfered with commerce (an element of the Hobbs Act violation) by obstructing the interstate *exportation* of the yet-to-be manufactured *steel* from that mill. *Id.* The Court found that to be a constructive amendment, noting that "when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another." *Id.* at 218.

## B. Prejudicial Variance

We also do not find that the evidence at trial prejudicially varied from the superseding indictment. "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment."[59] To warrant reversal, the defendant must show "that substantial prejudice occurred at trial as a result" of the variance.[60] "A defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense."[61]

For the reasons discussed in the context of constructive amendment, we do not think that the evidence Korchevsky points to "materially differe[d]" from what was alleged in the superseding indictment.[62] And in any event, Korchevsky cannot demonstrate "substantial prejudice."[63] The superseding indictment itself put Korchevsky on notice of much of the evidence about which he complains. To the extent he had not been on notice of every piece of trade data, he was notified by the government's pretrial disclosures

---

[59] *Dove*, 884 F.3d at 149 (internal quotation marks omitted).

[60] *Id.* (internal quotation marks omitted).

[61] *Salmonese*, 352 F.3d at 621–22 (internal quotation marks omitted).

[62] *Dove*, 884 F.3d at 149.

[63] *Id.*

of exhibits about the trades it intended to rely upon and of the vast data set underlying its statistical analysis of his trading activity.

## IV.    Response to Jury Note

Korchevsky argues that the district court's response to a jury note during deliberations caused the jury to resolve a disputed factual question against him.  We review a trial court's response to a jury request during deliberations only for abuse of discretion,[64] and we find none here.

The fact in dispute was whether Korchevsky had traded on any stolen press releases from the Dubovoys.  Korchevsky contended he had never received them.  To prove that he had, the government introduced forensic reports for a number of electronic devices seized from Korchevsky's home, including a 221-page report on the contents of an iPad.  The forensic report indicated that the iPad had been used to access the "stargate11@e-mail.ua" email account (Stargate Account).  On July 30, 2012, the Stargate Account sent four emails to itself, each containing the one-word message "Updates" along with an attachment.  Forensics could not recover the attached files.  Other evidence at trial, however, established that the conspirators shared login credentials for communal email accounts in order to disseminate the press releases amongst themselves.

The government urged the jury to infer that the July 30 Stargate Account emails attached stolen press releases, that Korchevsky had

---

[64] *See United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007) ("[R]esponse to jury request 'is a matter committed to the sound exercise of a trial court's discretion.'" (quoting *United States v. Young*, 140 F.3d 453, 456 (2d Cir. 1998))).

read the emails on the iPad, and that he had relied upon these attachments in his stock trades. Korchevsky, on the other hand, claimed that somebody else had accessed the Stargate Account from the iPad. He suggested it was Igor, pointing to evidence that Igor's Skype account had been used on that iPad in December 2012.

During deliberations, the jury sent out a note requesting "Any and ALL Texts[,] Phone calls[,] Emails[,] Bank records To and/or From Korchevsky on or in any devices found in his residence, or offices possession past or at time of arrest."[65] While the parties and the court were discussing whether the iPad evidence would be responsive to that request, the jury sent out a second note, this time asking for "Korchevsky – Stargate – dubavoy correspondence."[66] The defense argued that there was no such correspondence. Further, it argued that if the district court sent the iPad report back to the jury, the district court would be endorsing the government's argument that Korchevsky had used the iPad to access the Stargate Account. The district court decided to send the iPad report to the jury. It also permitted the government place a flag on the page concerning the July 30 Stargate Account emails.

We do not find an abuse of discretion in the district court's response to the jury's request. The jury's "Korchevsky – Stargate – dubavoy correspondence" note was not entirely clear, and we think the district court "gave it a reasonable interpretation"[67] by inferring

---

[65] App. at 820.

[66] *Id.* at 821.

[67] *See United States v. McElroy*, 910 F.2d 1016, 1026 (2d Cir. 1990) ("[T]here plainly was no abuse of discretion here. The jury's written response to the court's

from the "Stargate" mention that the jury hoped to receive the Stargate Account emails in the iPad report.  District courts are significantly better situated than we are to interpret cryptic jury notes, and they accordingly "enjoy[] considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry."[68]  We find no reason to upset that exercise of discretion here.

## V.    Conscious Avoidance

The defendants challenge the district court's decision to charge the jury that conscious avoidance can satisfy the knowledge requirement.  They also challenge the particular instruction given.  We find no merit in these challenges.

"Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law."[69]  "Objectionable instructions are considered in the context of the entire jury charge, and reversal is required where, based on a review of the record as a whole, the error was prejudicial or the charge was highly confusing."[70]

A conscious avoidance charge is appropriate: "(i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction[,] and (ii) the appropriate factual predicate for

query was ambiguous, and the trial judge gave it a reasonable interpretation in rereading the cross-examination by the government and asking if that was what the jury wished to hear.").

[68] *Rommy*, 506 F.3d at 126.

[69] *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014) (internal quotation marks omitted).

[70] *Id.* (internal quotation marks omitted).

the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."[71]   Even where the government's primary theory is that the defendant has actual knowledge, a conscious avoidance charge can be properly given in the alternative "because ordinarily the same evidentiary facts that support the government's theory of actual knowledge also raise the inference that he was subjectively aware of a high probability of the existence of illegal conduct and thus properly serve as the factual predicate for the conscious avoidance charge."[72]

The district court in this case gave the following conscious avoidance instruction to the jury, over Khalupsky's objection:

> [T]he government is required to prove that the defendants acted knowingly.   To determine whether the defendant acted knowingly[,] you may consider whether the defendant deliberately closed his eyes as to what would otherwise have been obvious to him.   If you find beyond a reasonable doubt that the defendant acted or that the defendant's ignorance was solely and entirely the result of a conscious purpose to avoid learning the truth, then this element may be satisfied.   However, guilty knowledge may not be established by

---

[71] *Lange*, 834 F.3d at 76 (internal quotation marks omitted).

[72] *Id.* at 78 (internal quotation marks and alterations omitted).

demonstrating that the defendant was merely negligent, foolish, or mistaken . . . .

If you find that the defendant was aware of the high probability that the press releases were stolen, and that defendant acted with deliberate disregard of that fact, you may find the defendant acted knowingly. However, if you find that the defendant believed that the information was lawfully obtained, he must be found not guilty.

It is entirely up to you whether you find the defendant deliberately closed his eyes[,] and any inferences to be drawn from the evidence on this issue.[73]

In challenging this instruction on appeal, Khalupsky argues both that there was no factual predicate warranting a conscious avoidance instruction, and that the instruction led the jury to believe that conscious avoidance could satisfy the intent needed to convict on conspiracy or aiding and abetting. Korchevsky joins these arguments in reply, and also argues that the language of the conscious avoidance instruction was prejudicial.

We first reject the argument that there was no factual predicate for the conscious avoidance instruction. The inclusion of the charge was properly objected to before the district court, so we review de novo.[74] We find that the record contained ample evidence from which a jury could reasonably infer that "the defendant[s] w[ere] aware of a

---

[73] App. at 680–81.

[74] *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011).

high probability of the fact in dispute and consciously avoided confirming that fact."[75]  As to Khalupsky, the government presented evidence that he had received passwords to access the press releases on which his employees were trading.  The jury would have been entitled to infer that the need for password-protection signaled to Khalupsky that the press releases—documents usually publicly disseminated without need for security—had been illicitly obtained, and that he chose not to confirm that suspicion.  Similar reasoning prevails as to Korchevsky, because there was evidence that Arkadiy had shown Korchevsky printouts of the press releases and provided him with login credentials to access the information.

Second, we reject the argument that the conscious avoidance instruction confused the jury into thinking that it could convict on conspiracy or on aiding and abetting without finding the necessary intent.  As the defendants concede, because they did not object before the district court to any particular language in the charge, we review this issue only for plain error.[76]  It is not "clear or obvious" to us, as it must be on plain error review, that the charge confused the jury in the way defendants claim.[77]

As to conspiracy, we do not think the jury could have convicted the defendants by finding only conscious avoidance of the fact of participation in the conspiracy.  Conscious avoidance may satisfy the

---

[75] *Lange*, 834 F.3d at 76 (internal quotation marks omitted).  It is undisputed that the first condition necessary for a conscious avoidance charge—that the "defendant asserts the lack of some specific aspect of knowledge required for conviction"—was satisfied.  *Id.*

[76] *See United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013).

[77] *See id.* at 70 (defining plain error).

defendant's "knowledge of the conspiracy's unlawful goals," but it may not be used to support the defendant's prerequisite "knowing participation or membership in the scheme charged."[78] The jury instructions made clear that proof of membership in the conspiracy required a showing of actual knowledge. In describing what the government needed to prove to show that the defendants joined the conspiracy, the district court charged that it had to prove a defendant "knowingly *and willfully* was or became a member of the conspiracy," and that he became a member "with knowledge of its criminal goal, *willfully and intending* by his actions to help it succeed."[79] Further, the district court defined "willfully" as something "done knowingly and purposefully with intent to do something the law forbids."[80]

Nor do we think there was any risk that the jury convicted on the aiding and abetting theory of securities fraud—a specific intent crime[81]—by finding only conscious avoidance. The district court charged the jury that, "in order to aid and abet someone to commit a crime, it is necessary that the defendant knowingly aid[] another person in committing a crime with the intent to facilitate the crime and make it succeed."[82] It went on to explain that "[t]o establish that the defendants knowingly aided another person with the intent to facilitate a crime, the [g]overnment must prove the defendants of course acted knowingly *and intentionally*."[83] Nowhere in the

---

[78] *Lange*, 834 F.3d at 76 (internal quotation marks omitted).

[79] App. at 646–47 (emphases added).

[80] *Id.* at 647.

[81] *United States v. Rosemond*, 572 U.S. 65, 70–77 (2014).

[82] App. at 661–62.

[83] *Id.* at 662 (emphasis added).

discussion of aiding and abetting liability did the court reference conscious avoidance as a relevant form of that intent.

Third, we reject Korchevsky's argument that the conscious avoidance charge given in this case was prejudicial. Korchevsky asserts that the district court's instruction to the jury presupposed that Korchevsky had seen the stolen press releases, and therefore prejudiced the jury in disposing of a disputed fact. Korchevsky did not make this objection to the district court, however, and we do not think any potential for confusion in this respect rises to the level of plain error. Indeed, we think it clear that the district court was referencing the stolen press releases by way of example in order to demonstrate to the jury how conscious avoidance operates. Lest the jurors be confused, the district court reiterated Korchevsky's theory in defense—that "he did not knowingly and intentionally access stolen press releases or trade on non-public information"[84]—immediately after charging on conscious avoidance.

Finally, we note that even if we had found any error in the issuance or form of this conscious avoidance instruction, we would have found the error harmless. The "overwhelming evidence" of actual knowledge in support of the jury's verdict, coupled with the fact that the government did not at all rely on conscious avoidance in its summation, renders this dispute over conscious avoidance beside the point.[85]

---

[84] *Id.* at 681.

[85] *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 1993) ("[A]n erroneously given conscious avoidance instruction constitutes harmless error if the jury was charged on actual knowledge and there was overwhelming evidence

**CONCLUSION**

We have considered all of the defendants' arguments and found them without merit. For the foregoing reasons, we **AFFIRM** the judgments of conviction.

---

to support a finding that the defendant instead possessed actual knowledge of the fact at issue." (internal quotation marks and emphasis omitted)).